GENERAL COMMITTEE OF ADJUST-
MENT, UNITED TRANSPORTATION
UNION, WESTERN MARYLAND
RAILWAY COMPANY, Appellant,

v.

CSX RAILROAD
CORPORATION, Appellee.

No. 89–5246.

United States Court of Appeals,
Third Circuit.

Argued Oct. 23, 1989.

Decided Jan. 5, 1990.

Rehearing and Rehearing In Banc
Denied Feb. 22, 1990.

John O'B. Clarke, Jr. (argued), Richard S. Edelman, Highsaw & Mahoney, P.C., Washington, D.C., for appellant.

Ronald M. Johnson (argued), T. Jay Thompson, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C. and Nicholas S. Yovanovic, CSX Transp., Inc., Jacksonville, Fla., for appellee.

Before HUTCHINSON, NYGAARD and WEIS, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

General Committee of Adjustment, United Transportation Union, Western Maryland Railway Company (the Union) appeals the district court's order dismissing its complaint against CSX Transportation, Inc. (CSX, or the Railroad)[1] and the court's order granting summary judgment for CSX on the counterclaim. By separate order, the district court also enjoined the Union from striking over this dispute. The Union asserts that the Railroad's proposed sale of a rail line without bargaining with the Union in accordance with the Railway Labor Act (RLA, or the Act) violates the Railroad's obligation to maintain the status quo pending completion of negotiations, an obligation imposed by § 2 Seventh and § 6 of the Act, 45 U.S.C.A. §§ 152 Seventh, 156 (West 1986).[2]

---

1. CSX is referred to as CSX Railroad Corp. in the caption to this case, although its name is actually CSX Transportation, Inc. *See* Brief for Appellant at 1 n. 1.

2. Section 2 Seventh of the Railway Labor Act reads:
   No carrier, it officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.
   45 U.S.C.A. § 152 Seventh (West 1986).
   Section 6 of the Act reads:

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have

According to the Union, the Railroad's actions in the face of a § 6 notice the Union filed seeking to amend the existing collective bargaining agreements between the parties created a "major" dispute under the Act. Thus, it argues that the Railroad should be enjoined from selling the rail line until the Act's major dispute resolution procedures have been completed. The Railroad contends that the dispute should be characterized as minor and, in its counterclaim, sought a declaration that it need not bargain with the Union before selling the line.

We hold that the dispute between the Union and the Railroad was a "minor" dispute for purposes of the Act. It is a minor dispute because it is arguable that the existing agreements between the parties, when interpreted and applied within the context of their past practices, can conclusively resolve the dispute. It was proper for the district court to dismiss the Union's complaint since § 3 of the Act requires that minor disputes be referred to the National Railroad Adjustment Board (Board), or an adjustment board established by the parties, for arbitration. *See* 45 U.S.C.A. § 153 (West 1986). Moreover, established procedures under the Act allow each party to act on its own interpretation of the agreements until a decision has been reached through arbitration. The district court did not err in granting summary judgment to the Railroad on its counterclaim. In addition, since the dispute was minor, we also hold that the district court's order enjoining the Union from calling a strike over the disputed sale is proper. Accordingly, we will affirm the district court's order on both the original complaint and the counterclaim as well as its separate injunction against a strike.

been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.
45 U.S.C.A. § 156 (West 1986).

## I.

CSX owns and operates the rail lines of what was formerly the Western Maryland Railway Co. (Western Maryland). The rail lines are part of CSX's 21,000 mile rail system. The Union is the collective bargaining representative for CSX locomotive engineers and trainmen who work on the former Western Maryland lines. CSX has assumed the collective bargaining agreements between its predecessor, Western Maryland, and the Union that govern rates of pay, rules and working conditions.

CSX claims that both it and Western Maryland had a practice of abandoning or selling marginal rail lines that had experienced decreases in traffic volume.[3] The "York line" segment of CSX's Western Maryland holdings, a sixteen-mile stretch of track in Pennsylvania between York and Porters, was such a line. The traffic on it had decreased by about 65% between 1979 and 1986. Joint Appendix (App.) at 44. In November 1987, CSX entered into a contract to sell the York line to Yorkrail, Inc. (Yorkrail), a locally-based operator and subsidiary of Emons Holdings, Inc. (Emons).

Before the sale could be completed, Yorkrail had to get Interstate Commerce Commission (ICC) approval to acquire and operate the line. Since it was a newly created short line railroad company categorized as a "non-carrier," it was presumptively excused from the need to go through individual case proceedings before the ICC to establish generally that its purchase served the public convenience and necessity and specifically whether labor protective conditions should be imposed on the sale under the Interstate Commerce Act, 49 U.S.C.A. § 10901 (West Supp.1989), by 49 U.S.C.A. § 10505 (West Supp.1989). *See*

3. The Railroad claims, without contradiction by the Union, that lines on the Western Maryland rail system have been sold or abandoned on at least twenty-nine occasions in the last ten years. This has reduced Western Maryland's lines from 930 to 406 miles of track. It has also led to the abolishment of certain train assignments and positions, employee reassignments to different positions and occasional furloughs. *See* Brief for Appellee at 3–4.

*Ex Parte No. 392 (Sub No. 1), Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. 10901,* 1 I.C.C.2d 810 (1985), *review denied sub nom., Illinois Commerce Comm'n v. ICC,* 817 F.2d 145 (D.C.Cir.1987). *See generally Pittsburgh & L. E. R.R. v. Railway Labor Executives' Ass'n,* —— U.S. ——, 109 S.Ct. 2584, 2590–91 & n. 9, 105 L.Ed.2d 415 (1989) (explaining why the ICC made approval easier for new entities purchasing marginally profitable and unprofitable rail lines from existing carriers). Consequently, Yorkrail received automatic approval seven days after filing a notice of exemption, *see* 49 C.F.R. § 1150.32(b) (1987), and its exemption became effective on December 2, 1987.

Emons also needed approval to own an additional line under the Interstate Commerce Act, 49 U.S.C.A. § 11343 (West Supp.1989). However, the ICC granted Emons an exemption, under § 10505, from the § 11343 approval requirement. This exemption became effective on January 4, 1988. *See Emons Holdings, Inc.—Continuance in Control Exemption—Yorkrail, Inc.,* Finance Docket No. 31170 (ICC Dec. Dec. 18, 1987), *reprinted in* Brief for Appellant, Addendum No. 3. Despite receiving these necessary approvals, CSX's sale of the York line to Yorkrail and Emons was not completed at this time.

Meanwhile, on December 7, 1987, the Union filed a complaint in the United States District Court for the Middle District of Pennsylvania asking the court to enjoin the proposed sale of the York line and to otherwise maintain the status quo until the Railroad had bargained with the Union over the

sale and exhausted the RLA's dispute resolution requirements. The Union relied on a § 6 notice it had served on the Railroad in August 1987. The § 6 notice sought to amend the existing collective bargaining agreements to provide that if part of the Railroad's Western Maryland lines were sold or transferred, Union employees would have a right to continue to work on the property under the existing agreements.[4] The Railroad counterclaimed, seeking a declaration from the court that it had no duty to bargain with the Union before selling the York line. Later, it moved for dismissal of the Union's complaint and summary judgment on its counterclaim.

The district court referred the matter to a magistrate, who filed a report on November 9, 1988 recommending that the district court rule in favor of the Railroad on both its motion for dismissal and its request for summary judgment on the counterclaim. *See* Report of Magistrate, App. at 530. The magistrate noted that the parties agreed to certain facts concerning the existing collective bargaining agreements between the Railroad and the Union that supported his recommendations. First, with regard to the agreements' explicit reduction in force and furlough provisions, the parties agreed:

> 5. The reduction in force and furlough provisions in the agreements between [CSX] and the [Union] afford [CSX] the unilateral right to abolish train assignments and to reduce the number of engine and train positions. [CSX] must give eight hours notice of a yard assignment abolishment and three hours notice of a road assignment abolishment.

---

4. A § 6 notice formally advises one party that the other wishes to amend the existing collective bargaining agreement. *See* 45 U.S.C.A. § 156. The Railroad met with the Union about the August 1987 § 6 notice, but claimed that the notice was ineffective under the moratorium provision of the 1985 national agreement between the Union and several large rail carriers, including CSX. The moratorium provided that existing collective bargaining agreements between the Union and participating rail carriers were not subject to amendment until April 1, 1988.

On April 1, 1988, after the moratorium period had expired, the Union filed another § 6 notice

with the Railroad. It requested the same amendment to the collective bargaining agreements as the August 1987 notice. We agree with the parties and the magistrate's conclusion that this notice was effective and that the dispute over the effectiveness of the August 1987 notice is now moot. *See* Report of Magistrate, App. at 544 n. 5.

The Railroad has expressed a willingness to bargain over the April 1988 notice as it relates to proposed prospective changes in the existing collective bargaining agreements, but says that it cannot be forced to postpone the York line sale while negotiations are continuing. Brief for Appellee at 35.

6. The collective bargaining agreements between the parties also address the effects of train assignment abolishments on employees. Pursuant to the agreements, a trainman or engineer whose train assignment has been abolished may bid on other assignments on the basis of seniority and, if a position is not available, be furloughed. Furloughed employees are entitled to certain benefits. While furloughed, an employee remains an employee of [CSX], continues to accrue seniority and is subject to being recalled to fill positions which may become available. Furloughed employees' health and welfare insurance premiums are paid by [CSX] for four months.

*Id.* at 538–39 (citations and footnote omitted).

In addition, the parties stipulated to facts concerning their past practices with respect to line sales and the abolishment of job assignments. They agreed that the Railroad "has abolished train assignments on numerous occasions resulting in a decrease of the [Union] represented workforce employed on the former [Western Maryland lines] of approximately 66%," *id.* at 540, and that segments of the Western Maryland lines have been sold on three occasions since 1983. *Id.* Over fifty Union employees were displaced as a result of these three sales, but no § 6 notices were filed by the Union at the time. *Id.* at 540–41.[5] The magistrate concluded in his report that it was at least arguable that the dispute between the Union and the Railroad was addressed by the existing collective bargaining agreements. Because of that, he concluded that the dispute was a minor one and must be resolved by arbitration before the Board. *Id.* at 546.

While the Union filed exceptions to the magistrate's report with the district court, the Railroad announced its intention to complete the York line sale. Because the Railroad was concerned lest the Union strike over the sale, it filed a motion for a

temporary restraining order and a preliminary injunction against such a strike. *See id.* at 549, 551. It claimed that a strike would violate the RLA's minor dispute resolution procedures and be contrary to the magistrate's recommendations. The parties then agreed to a stipulated order, also approved by the district court, that restrained the Union from striking over the sale. *Id.* at 569. Again, the Railroad did not complete the sale at this time.

On February 17, 1989, while its exceptions to the magistrate's report were still pending with the district court, the Union moved for a preliminary injunction to enjoin completion of the York line sale. *Id.* at 574. The Union said the Railroad's claim that this was a minor dispute based on the existing collective bargaining agreements and established past practices of the parties was no longer arguable. It relied primarily on the arbitration decision of the Special Board of Adjustment,[6] in a matter referred to the board by *Decker v. CSX Transp.*, 688 F.Supp. 98 (W.D.N.Y.1988), *aff'd sub nom. CSX Transp. v. United Transp. Union*, 879 F.2d 990 (2d Cir.1989), *petition for cert. filed*, 58 U.S.L.W. 3291 (U.S. Oct. 6, 1989) (No. 89–565). *See* App. at 580 (copy of *Decker*-related arbitration proceeding is attached to the Union's motion). It claimed the decision so weakened the Railroad's position that a dispute about jobs that would be abolished as a result of a sale was a minor dispute 'that it was no longer even arguable. Because jobs would be abolished as a result of the York line sale, the Union argued that the RLA's major dispute resolution procedures in § 6 applied and that the Railroad should be forced to comply with the Act's bargaining and status quo requirements.

The district court denied the Union's preliminary injunction motion after a hearing. *Id.* at 701. Then, on February 24, 1989, the court denied the Union's exceptions and adopted the magistrate's report and recommendations. *General Comm. of Adjust-*

---

5. The magistrate did note that the ICC imposed protective labor conditions in connection with two of the sales. App. at 540–41.

6. This board has been established by the parties, as allowed by 45 U.S.C.A. § 153, to arbitrate disputes in place of the National Railroad Adjustment Board. *See* App. at 581.

ment v. CSX R.R., No. 87–1712, 1989 WL 88580 (M.D.Pa. Feb. 24, 1989), *reprinted in* App. at 702–10. On the evidence submitted, the district court rejected the Union's argument that past sales of Western Maryland lines had always involved lines that were to be abandoned by CSX. The court then distinguished this situation from the one in *Railway Labor Executives' Ass'n v. Pittsburgh & L. E. R.R.*, 845 F.2d 420 (3d Cir.1988), *rev'd*, —— U.S. ——, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989). It also stated that the arbitration panel's decision in the *Decker*-related proceeding did not alter its conclusion that a minor dispute was involved here and that therefore the matter was within the exclusive jurisdiction of the Board under § 3 of the RLA. Hence, it dismissed the Union's complaint and granted summary judgment to the Railroad on the counterclaim. The Union filed a timely notice of appeal with this Court.

## II.

We have jurisdiction over this appeal from a final order of the district court pursuant to 28 U.S.C.A. § 1291 (West Supp.1989). The district court had subject matter jurisdiction in this action involving various provisions of the Railway Labor Act, 45 U.S.C.A. § 151–188 (West 1986), pursuant to 28 U.S.C.A. § 1337(a) (West Supp.1989). *See Felter v. Southern Pac. Co.*, 359 U.S. 326, 329, 79 S.Ct. 847, 851, 3 L.Ed.2d 854 (1959).

In order to determine if the district court's dismissal of the Union's complaint was proper, we must decide whether the dispute between the Railroad and the Union was "major" or "minor." Since this is a legal question, we exercise plenary review over the district court's conclusion that this case involved a minor dispute and that therefore the Union's complaint should be dismissed. *See Railway Labor Executives' Ass'n v. Consolidated Rail Corp.*, 845 F.2d 1187, 1189 (3d Cir.1988), *rev'd on other grounds*, —— U.S. ——, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989).

We also have plenary review over the district court's grant of summary judg-

ment in favor of the Railroad on its counterclaim and apply the same test that the district court should have used. *United States v. St. John's General Hosp.*, 875 F.2d 1064, 1067 (3d Cir.1989); *Forum Ins. Co. v. National Union Fire Ins. Co.*, 865 F.2d 584, 585–86 (3d Cir.1989). In other words, we must determine whether there is no genuine issue of material fact and that the Railroad is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Inferences to be drawn from the facts in evidence should be viewed in the light most favorable to the Union. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

## III.

The central issue presented to us on appeal is whether the dispute between the Railroad and the Union over the expected sale of the York line to Yorkrail and Emons is properly characterized as "major" or "minor" under the Railway Labor Act. We have recently discussed the distinction between major and minor disputes in *Railway Labor Executives' Ass'n v. Pittsburgh & L. E. R.R.*, 845 F.2d 420 (3d Cir.1988), *rev'd*, —— U.S. ——, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989). In that opinion, we emphasized that major disputes involve changes in the rates of pay, rules, or working conditions that are currently part of existing collective bargaining agreements, while minor disputes involve disagreements over the interpretation or application of specific provisions within existing agreements.

The Railway Labor Act is the product of a joint effort by labor and management representatives to channel labor disputes into constructive resolution procedures as a means of avoiding interruptions to commerce and preventing strikes. There are two types of disputes that can arise under the RLA—"major" disputes, which involve efforts to form or proposals to change collective bargaining agreements, and "minor" disputes, which requires the interpretation or application

590

of a specific provision of a collective bargaining agreement.

Major disputes "look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past"; in minor disputes, "the claim is to rights accrued, not merely to have new ones created for the future." Minor disputes are resolved through a formal grievance process that culminates in binding arbitration performed by the National Railroad Adjustment Board. Major disputes, on the other hand, are channeled into an exhaustive bargaining process, designed to force the parties into serious negotiation and to encourage compromise.

When a minor dispute arises, the parties are not precluded from changing the status quo; management is free to implement its interpretation of the agreement, unless and until the interpretation is held invalid by the Adjustment Board.

Major disputes, however, trigger a status quo obligation. Once a party proposes a change in the collective bargaining agreement, that party is required to serve notice of its intentions (a "section 6 notice"), and both parties must maintain the status quo until the RLA bargaining processes have been exhausted. Those processes have been described by the Supreme Court as "almost interminable."

*Id.*, 845 F.2d at 423–24 (citations and footnote omitted).

The Supreme Court has recently articulated a clear standard for differentiating between major and minor disputes in railway labor cases. In *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, — U.S. —, 109 S.Ct. 2477, 105 L.Ed.2d

250 (1989) (*Conrail*), the Court explained that

> the formal demarcation between major and minor disputes does not turn on a case-by-case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic selfhelp. Rather, the line drawn in [*Elgin, J. & E.R. Co. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945)] looks to whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action. The distinguishing feature of such a case is that the dispute may be conclusively resolved by interpreting the existing agreement.

*Id.* 109 S.Ct. at 2481 (citations omitted). This is the standard that we must apply in determining whether the dispute between CSX and the Union is major or minor.

The Union suggests that we rely on the Supreme Court's opinion in *Pittsburgh & Lake Erie* to classify the controversy over the York line sale as a major dispute. In that case, the Supreme Court concluded that certain bargaining and status quo requirements in § 6 became relevant when a railroad company attempted to sell its entire rail line system and go out of business in the face of a § 6 notice filed by a union. *See* 109 S.Ct. at 2597.

*Pittsburgh & Lake Erie* differs in important respects from our situation and is not directly controlling.[7] It involved the sale of a railroad company's entire rail system and the expected loss of about two-thirds of the existing union jobs, compared with CSX's sale of an individual, sixteen-mile line that would affect less than ten Union employees.[8] More importantly, there was

7. We do note that the Supreme Court imposed only limited bargaining and status quo requirements in *Pittsburgh & Lake Erie*, and the railroad was permitted to complete its transaction without first gaining union approval. *See* 109 S.Ct. at 2593–96, 2597. Moreover, the Court specifically embraced the railroad's argument that its decision to sell the company and the impact this sale would have on employees, by itself, did not create a "change in *agreements* affecting rates of pay, rules, or working conditions" that would force the railroad to satisfy

§ 6's dispute resolution requirements. *Id.* 109 S.Ct. at 2592–93 (emphasis in original).

8. The district court found that, at most, nine Union employees would be affected by the York line sale. *General Committee of Adjustment*, slip op. at 5, *reprinted in* App. at 706. Most of these employees would be able to exercise their seniority to obtain other jobs on Western Maryland lines. The court later inferred that perhaps three employees would be furloughed as a result of the sale and subsequent "bumping." Slip op. at 7, *reprinted in* App. at 708.

no assertion in *Pittsburgh & Lake Erie* that the existing collective bargaining agreements between the company and the union allowed such a sale. Indeed, we noted:

> There is no argument about whether the collective bargaining agreement *itself* permits or prohibits the proposed sale. If *that* were the crux of the dispute, then this case would require an interpretation of the agreement, and would thus be a minor dispute, to be resolved by arbitration. P & LE's agreements with its unions, however, do not appear to contemplate this type of transaction....

845 F.2d at 428 n. 9 (emphasis in original). Here, however, the Railroad's central argument is that the existing collective bargaining agreements, in the context of past practices, allow it to abandon and sell individual rail lines without bargaining beforehand with the Union.

For similar reasons, we cannot rely on *Order of R.R. Telegraphers v. Chicago & N.W. R.R.*, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). In *Railroad Telegraphers*, a union sought to amend an existing collective bargaining agreement to require a railroad to bargain with the union over jobs that were to be discontinued. The Supreme Court held that where the railroad decided to exercise its management prerogative to close a number of stations and the union filed a § 6 notice in response, a major dispute arose and the impact of the railroad's decision on the job security of union employees was a proper subject for the RLA's bargaining requirements. However, unlike the situation here, the railroad in *Railroad Telegraphers* did not claim that established practice under the existing collective bargaining agreement allowed it to sell rail lines on its own. Thus, *Railroad Telegraphers* is not dispositive.

To properly classify the dispute between the Railroad and the Union, our focus must remain on the standard announced by the Supreme Court in *Conrail*. We must determine whether it is arguable that the dispute can be "conclusively resolved" by interpreting the existing agreements between the parties. The Railroad asserts that the existing collective bargaining agreements and established past practices allow it to abandon or sell individual rail lines without first bargaining with the Union over jobs that may be lost. We must therefore consider whether this assertion is "arguably justified" by the terms of the collective bargaining agreements.

█ If it is an arguably justifiable and not obviously insubstantial interpretation of the existing agreements, then the dispute is minor under the RLA. *See Conrail*, 109 S.Ct. at 2482 ("Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major."). The burden of establishing that a dispute is minor under the RLA is "relatively light." *Id.* Accordingly, in close cases, disputes are characterized as "minor." *See Brotherhood of Locomotive Eng'rs v. Atchison, T. & S. F. Ry.*, 768 F.2d 914, 920 (7th Cir.1985) ("when in doubt, the courts construe disputes as minor"). Contrary to the Union's contention, *see* Brief for Appellant at 37–38, the Railroad's claim of existing coverage under the agreement need not be "clear and unmistakable" before the matter is declared a "minor" dispute. *See Southeastern Pa. Transp. Auth. v. Brotherhood of R.R. Signalmen*, 882 F.2d 778, 783–84 (3d Cir.1989) (*SEPTA* ), *petition for cert. filed*, 58 U.S.L.W. 3353 (U.S. Nov. 13, 1989) (No. 89–756).

█ As the Supreme Court also made clear in *Conrail*, both express and implied provisions of a collective bargaining agreement must be considered when determining whether action is "arguably justified" by the terms of the agreement. 109 S.Ct. at 2485 ("collective-bargaining agreements may include implied as well as express terms"). It is a well-established rule that the parties' "practice, usage and custom" is very significant in interpreting the agreement, *id.*, especially as it demonstrates a mutual understanding between the parties

on a particular issue. *United Transp. Union v. St. Paul Union Depot*, 434 F.2d 220, 222–23 (8th Cir.1970), *cert. denied*, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971). Thus, either express or implied contractual terms, as interpreted through established past practice, will serve to classify a dispute as minor. *See SEPTA*, 882 F.2d at 784; *Air Line Pilots Ass'n v. Eastern Air Lines*, 863 F.2d 891, 896 (D.C.Cir.1988) ("To gain a complete picture of the relationship between the parties, and thus of the scope of the dispute to be settled by the provisions of the RLA, courts must consider the express terms of any agreements and well established practices that have developed through the past course of dealings."), *petition for cert. filed*, 57 U.S.L.W. 3603 (U.S. Feb. 24, 1989) (No. 88–1403); *Chicago & N.W. Transp. Co. v. Railway Labor Executives Ass'n*, 855 F.2d 1277, 1282 (7th Cir.) ("courts are permitted to look to the 'settled past practices of the parties' under [the] agreement") (quoting *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington N. R.R.*, 802 F.2d 1016, 1017 (8th Cir.1986)), *cert. denied*, —— U.S. ——, 109 S.Ct. 493, 102 L.Ed.2d 529 (1988); *United Transp. Union v. Penn Cent. Transp. Co.*, 372 F.Supp. 671, 677 (E.D.Pa. 1973), *aff'd*, 505 F.2d 542 (3d Cir.1974).

After examining all of the evidence submitted to the magistrate and the district court, we believe the Railroad arguably had authority under existing collective bargaining agreements and established past practices to sell individual rail lines to third parties without first bargaining with the Union. The reduction in force and furlough provisions in the agreements allowed the Railroad to unilaterally abolish job assignments after giving notice. They also addressed the rights that Union employees had when jobs were abolished—namely, the right to bid on other assignments and "bump" other employees on the basis of seniority and to receive certain benefits if furloughed. The agreements do not limit the reduction in force and furlough provisions to situations that do not involve sales.

The Railroad has disposed of rail lines on numerous occasions, leading to the abolishment of many job assignments. Indeed, it has sold segments of the Western Maryland lines on three other occasions since 1983. While labor protective conditions were imposed in two of these earlier sales, no claims were then made by the Union that the Railroad was acting outside the scope of the existing agreements, even though Union employees were obviously affected by the sales.[9]

Thus, this dispute is a minor one involving the interpretation and application of the existing collective bargaining agreements between the parties, and it should be arbitrated before the Board as established by § 3 of the RLA. We note that several other courts have also categorized disputes involving rail line sales that caused the loss of union positions as minor under the RLA. *See CSX Transp. v. United Transp. Union*, 879 F.2d 990 (2d Cir.1989), *petition for cert. filed*, 58 U.S.L.W. 3291 (U.S. Oct. 6, 1989) (No. 89–565); *Chicago & North Western*, 855 F.2d at 1284–86; *Atchison, T. & S. F. Ry. v. Railway Labor Executives' Ass'n*, No. 87–C9847, 1989 W.L. 15965 (N.D.Ill. Feb. 17, 1989), *appeal dismissed*, No. 89–1468 (7th Cir. Aug. 3, 1989).

Our holding that this is a minor dispute and that the existing agreements between the parties, when considered in connection with established past practices, can conclusively resolve the dispute should not be taken to infer any judgment on our part on the merits of whether the Railroad has the authority to sell the York line without bargaining over its effects if Union jobs will in fact be lost as a result of the sale. The merits of that issue will be before the Adjustment Board as will the question of what remedy may be appropriate if it decides for the Union. As the United States

---

9. The Board will be able to fully consider the Union's argument that the proposed York line sale differs from the previous three sales in that the earlier sales involved the Railroad's right to abolish jobs due to fluctuations in the volume of business and the need to abandon particular rail lines, while this dispute is over the sale of an active line to another railroad. The Union also will have ample opportunity to explain why it did not attempt to assert § 6 bargaining procedures in these earlier situations.

Court of Appeals for the Seventh Circuit has stated:

> In deciding whether a dispute can be resolved by reference to the existing collective bargaining agreement(s) and relevant established past practice, "[t]he court does not consider the merits of the underlying dispute; its role is limited to determining whether the dispute can be characterized as involving the proper application or meaning of a contract provision."

*Chicago & North Western*, 855 F.2d at 1283 (quoting *Railway Labor Executives' Ass'n v. Norfolk & W. Ry.*, 833 F.2d 700, 704 (7th Cir.1987)).

We must also reject the Union's argument that the decision against the Railroad in the *Decker*-related proceedings is controlling. The Board merely concluded that a different collective bargaining agreement did not allow the Railroad to unilaterally sell former Baltimore & Ohio Railroad lines where union jobs would be abolished. It does not affect our holding that this dispute is a minor one and that the Railroad's action is arguably justified by the agreements. As the district court correctly noted, "the parties, contracts, background facts, and circumstances of the sale in the *Decker*-related arbitration proceeding are not the same as in the instant matter," *General Committee of Adjustment*, slip op. at 8, *reprinted in* App. at 709, and the arbitration decision has no binding effect on us. Slip op. at 9, *reprinted in* App. at 710. *See CSX Transportation*, 879 F.2d at 1003 (explaining that the Special Board of Adjustment's decision in *Decker*-related proceeding did not alter district court conclusion that minor dispute was involved); *Atchison, Topeka & Santa Fe*, No. 87–C9847, 1989 W.L. 15965 (N.D.Ill. Feb. 17,

1989) (in a post-*Decker* decision involving similar dispute, court affirmed its pre-*Decker* conclusion that dispute was "minor"), *appeal dismissed*, No. 89–1468 (7th Cir. Aug. 3, 1989).[10] We also note that a petition to review the *Decker*-related arbitration decision is still pending in a federal district court. *See CSX Transp. v. United Transp. Union*, No. 88–1404C (W.D.N.Y.1988).

In addition, we see no merit in the Union's argument that the Supreme Court's opinion in *Conrail* gives the district court authority it should exercise to maintain jurisdiction in a minor dispute by staying its proceedings pending arbitration by the Board. The Court in *Conrail* adhered to the established major/minor categorization scheme and did not suggest that district courts should retain jurisdiction over disputes referred to the Board for arbitration. In minor disputes, the Board has full authority to resolve the matter and can grant a complete and adequate remedy to the prevailing party. *See Conrail*, 109 S.Ct. at 2481 ("The Board ... has exclusive jurisdiction over minor disputes."); *Chicago & North Western*, 855 F.2d at 1288 (legal remedies available from the Board are adequate to make prevailing party whole).

Federal courts are not required to retain jurisdiction in such disputes. Instead, they may dismiss the dispute and defer to the arbitration jurisdiction of the Board. Both the Union and the Railroad will have ample opportunity after a decision by the Board to seek judicial review or enforcement of any arbitration award, *see* 45 U.S.C.A. § 153 First (p), (q), and to continue protecting any rights they may have under § 6 of the RLA.[11]

---

**10.** Moreover, the decision of the adjustment board in the *Decker*-related proceedings will not have a decisive effect on any arbitration proceedings in connection with this dispute, for traditional judicial principles of stare decisis and res judicata are given significantly less weight in arbitration proceedings. *See Butler Armco Indep. Union v. Armco, Inc.*, 701 F.2d 253, 255 (3d Cir.1983) ("absent contractual language to the contrary, one arbitrator's interpretation of a collective bargaining agreement is

not binding on a subsequent arbitrator"); *Metropolitan Edison Co. v. NLRB*, 663 F.2d 478, 483 (3d Cir.1981), *aff'd*, 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983). The Union recognizes this point. *See* Brief for Appellant at 40 ("arbitration decisions are not binding on courts or other arbitrators").

**11.** There are limited circumstances in which a court may issue an injunction in minor disputes to preserve the status quo, when such action is necessary to keep pending arbitration proceed-

Finally, the Union's § 6 notice seeking certain changes in the existing collective bargaining agreements does not change this minor dispute over the proposed sale of the York line into a major one. The Union's § 6 notice does not serve to short-circuit the arbitration process Congress specifically designed to resolve minor disputes. Accordingly, we choose to follow the reasoning of those courts presented with disputes over proposed line sales that classified the disputes as minor even though § 6 notices were filed. *See CSX Transportation,* 879 F.2d at 1000 (if a dispute over a proposed line sale is minor, "the service of Section 6 notices by the appellant unions would have no transforming or alchemizing effect upon that situation"); *Chicago & North Western,* 855 F.2d 1284–86 (concluding that labor dispute over railroad's sale of short line was minor even though unions filed § 6 notices); *Atchison, Topeka & Santa Fe,* No. 87–C9847, 1989 W.L. 15965, at 1 (N.D.Ill. Feb. 17, 1989) ("In the context of the sale of a rail line, a union's service of notice of its intent to negotiate under the Section 6 major dispute procedures does not trigger the mandatory bargaining provisions of the RLA and bar the sale until bargaining is concluded."). *See also Air Line Pilots Association,* 863 F.2d at 900 ("We believe that a rule that allows a party to characterize all disputes as major through a unilateral action such as serving § 6 notices on the other party is unwise and contrary to the two-track procedure of the RLA."); *Rutland Ry. v. Brotherhood of Locomotive Eng'rs,* 307 F.2d 21, 33 (2d Cir.1962) ("[W]e must not place undue emphasis on the ... maneuvers of the parties.... Since a Section 6 notice is required by the statute in order to initiate a major dispute, the labor representatives are likely to serve such a notice in any dispute arising out of any ambiguous situation so as thereby to make the controversy appear more like a major dispute.") (citation omitted), *cert. denied,* 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963). *Cf. Railway Labor Executives' Ass'n v. Chicago & N.W. Transp. Co.,* No. 87–5071, 1989 W.L. 145427 (8th Cir. Nov. 29, 1989) (order) (major dispute where unions challenged rail line sale and railroad did not assert that agreement and established past practices permitted the sale).

For these reasons, we hold that the dispute between the Railroad and the Union over the proposed sale of the York line and the effects this sale may have on Union employees is a minor one and should be referred to the Board for binding arbitration under § 3 of the RLA.[12] Because a minor dispute is involved, § 6's bargaining and status quo requirements are inapplicable and the arguments made by the Union on the nature of these requirements are not pertinent. *See Conrail,* 109 S.Ct. at 2481 (there is no general statutory obligation for railroad to maintain status quo pending the arbitration decision in minor disputes); *United Transp. Union v. Penn Cent. Transp. Co.,* 505 F.2d 542, 545 (3d Cir.1974) ("[t]he status quo provision of section 6 does not apply to 'minor' disputes"). Each side can act on its interpretation of the existing agreements until the arbitration panel rules otherwise. *Penn Central,* 505 F.2d at 545; *Air Line Pilots Ass'n v. Eastern Air Lines,* 869 F.2d 1518, 1520 (D.C.Cir.1989).

In its brief, the Union raises the propriety of the district court's separate order enjoining the Union from striking. Of course, the Union has no right to strike while this minor dispute is under Board

ings from becoming meaningless. *See Conrail,* 109 S.Ct. at 2481 n. 5; *Air Line Pilots Ass'n v. Eastern Air Lines,* 869 F.2d 1518, 1520 n. 2 (D.C.Cir.1989). The Union made no request in the district court for such an injunction in this situation. Moreover, it does not appear to us that the Board would be unable to fashion an appropriate compensatory remedy if the Union prevails in the arbitration proceedings and can show that employees were injured by any ac-

tions the Railroad may take. *See Conrail,* 109 S.Ct. at 2484 n. 8.

**12.** Because we hold that this dispute is minor, we do not need to consider the Railroad's alternative argument that the ICC's approval of the York line sale to Yorkrail and Emons superceded the dispute resolution procedures in § 6 since the Interstate Commerce Act permitted the ICC to impose labor protective conditions as part of the sale.

consideration. It is well established that courts may enjoin threatened strikes arising out of minor disputes to protect the Board's exclusive jurisdiction, notwithstanding that the Norris–La Guardia Act (NLGA), 29 U.S.C.A. §§ 101–115 (West 1973 & Supp.1989), normally prohibits federal courts from issuing injunctions against strikes in labor disputes. *See Conrail,* 109 S.Ct. at 2481; *Brotherhood of R.R. Trainmen v. Chicago River & Ind. R.R.,* 353 U.S. 30, 42, 77 S.Ct. 635, 641, 1 L.Ed.2d 622 (1957); *Brotherhood of R.R. Trainmen v. Howard,* 343 U.S. 768, 774, 72 S.Ct. 1022, 1025, 96 L.Ed. 1283 (1952). A strike in this situation would make the minor dispute resolution procedures under the RLA ineffective and frustrate the statute's purpose of avoiding strikes and instead resolving minor disputes through binding arbitration. *See Brotherhood of Locomotive Eng'rs v. Louisville & N. R.R.,* 373 U.S. 33, 39, 83 S.Ct. 1059, 1063, 10 L.Ed.2d 172 (1963) (recognizing that in *Chicago River & Indiana,* the Court concluded that Congress "intended the grievance procedures of [§ 3] to be a compulsory substitute for economic self-help, not merely a voluntary alternative to it"). It was entirely appropriate for the district court to approve the stipulated injunctive order prohibiting a strike by the Union over the proposed York line sale.

### IV.

For the foregoing reasons, we hold that the conflict between the Union and the Railroad over the York line sale was a "minor" dispute under the RLA and that the entry of the injunction against a strike on stipulated terms was proper. Accordingly, we will affirm the order of the district court dismissing the Union's complaint and granting summary judgment to the Railroad on its counterclaim.