OPINION OF THE COURT
GREENBERG, Circuit Judge.
This matter comes on appeal from an order of the district court dated and entered on October 21, 2003, barring U.S. Airways, Inc. (U.S. Airways or the Company) from using an outside contractor to perform maintenance overhauls called S-Checks, mandated by the Federal Aviation Administration (FAA), on the Company’s narrow body Airbus aircraft. The district court concluded that the dispute between U.S. Airways and the International Association of Machinists and Aerospace Workers (the IAM) over whether such subcontracting was permissible constituted a major dispute under the Railway Labor Act, 45 U.S.C. § 151 et seq. (RLA).[1] For the reasons set forth below, we hold that the dispute is a minor one under the RLA, and therefore the district court lacked jurisdiction to issue the preliminary injunction.
I. BACKGROUND
A. Factual Background
The IAM is an unincorporated labor organization that is the certified collective bargaining representative of U.S. Airways mechanics and related personnel. District Lodge 1.41-M is the IAM’s negotiating arm. For more than 50 years, the IAM and U.S. Airways have been parties to collective bargaining agreements governing U.S. Airways mechanics and related employees. On August 11, 2002, U.S. Airways filed for Chapter 11 bankruptcy and implemented measures to reduce its operating costs. These measures included renegotiating the terms of its collective bargaining agreements, rejecting certain aircraft leases, rejecting real property leases, reducing wages and benefits for its management and non-union employees, and rejecting or renegotiating other agreements with its lessors, vendors, and suppliers.
1. The S-Check Requirement
FAA guidelines require U.S. Airways to perform S-Checks on its narrow body Airbus aircraft every five years. S-Checks are the most extensive type of scheduled maintenance checks, requiring a detailed inspection of the aircraft and repair of any discrepancies on the airframe, components, and engines. US Airways first S-Check *257 (on an aircraft it acquired in 1998) became due on October 15, 2003. US Airways had nine other S-Checks due by the end of 2003 and seven others are due in September 2004. As of January 2005, S-Checks will be required on an ongoing basis.
US Airways emerged from bankruptcy on March 31, 2003. It claims that until that time it could not properly arrange for the ten S-Checks that were due in 2003. At some point before October 6, 2003, U.S. Airways told the IAM that it may need to hire a vendor to perform the S-Checks because it lacked the necessary equipment and facilities to perform them itself. On October 6, 2003, U.S. Airways confirmed this need with the IAM with regard to its first ten S-Checks, but it said it would work with the IAM to identify means by which the remaining S-Checks could be performed in house.
2. The Collective Bargaining Agreement (CBA)
a. The Scope Clause (Article 2(B))
Article 2(B) of the CBA defines the scope of the work to be performed by IAM-represented employees:
The Company agrees that the following described work, wherever performed, is recognized as coming within the jurisdiction of the [IAM], and is covered by this Agreement: ... all work involved in dismantling, overhauling, repairing, fabricating, assembling, welding, and erecting all parts of airplanes, airplane engines, avionics equipment, electrical system, heating system, hydraulic system, and machine tool work in connection therewith....
The duties' of aircraft cleaning, lavatory servicing, potable water servicing, receipt and dispatch, ancillary duties associated with receipt and dispatch, and operation of ground power units may be performed by employees covered by this Agreement and/or other employees and vendors as described in Article 4 paragraphs J and N at those locations/shifts where such covered employees are not staffed. Aircraft towing may b performed by employees not covered by this Agreement at those locations/shifts where such covered employees are not staffed. It is not the intent of this paragraph to have non-Mechanieal and Related employees perform such work on shifts where covered employees are staffed except as provided for elsewhere in this agreement. It is the Company’s intent, however, to utilize all its equipment and facilities in performing work in its own organization. In' the event that a situation should develop whereby the equipment and facility limitations are not available or sufficient to perform such work, the Company will confer with the Union in an effort to reach an understanding with respect to how the problem is to be resolved. Receipt and dispatch, including the ancillary duties associated with receipt and dispatch, of Commuter Aircraft may be accomplished by employees not covered by the mechanic and related agreement.
JA 170; Appellees br. at 7.[2] The parties do not dispute that the scope language encompasses airframe' heavy maintenance (HMV) work, which is the type of work an S-Check requires.
There are two addenda to the CBA: (1) the Letter of Clarification (the First Clarification); and (2) Clarification of Article 2(B) (the Second Clarification).
b. The First Clarification
The First Clarification states that Section (B) of said Article 2 is recognized by *258 both parties as prohibiting the farming out of the types of work specified in said Section (B). JA 194.
c. The Second Clarification
The Second Clarification states that:
Relative to [the Scope clause], it is agreed that, within the limits hereinafter specified, the following listed exceptions to the coverage of Article 2 shall not be deemed in violation thereof:
(G) Types of work customarily contracted out, such as parts and material which the Company could not be expected to manufacture, such as engine and airframe parts, castings, cowlings, seats, wheels and other items which are commonly manufactured as standard items for the trade by vendors. Work subcontracted out to a vendor will be of the type that cannot be manufactured or repaired in-house by existing skills/equipment or facilities of the Company.
(I) Due to lack of facilities, the Company may subcontract the major overhaul of aircraft engines during the life of this Agreement.
JA 195-96. The IAM notes that neither HMV nor other maintenance work on aircraft airframes is mentioned in the list of subcontracting exceptions. The parties agree that HMV work is not the type of work that customarily has been contracted out.
3.Bargaining History
The IAM presents to the court past conduct on the part of U.S. Airways regarding the subcontracting of HMV work on its Boeing fleet. Specifically, the IAM notes that during negotiations in 1999 for a successor agreement (a major dispute), U.S. Airways sought to obtain the right to subcontract Q-Checks of its Boeing fleet, claiming that it lacked the facilities to perform the work. The IAM rejected U.S. Airways proposal, and thus, U.S. Airways did not achieve the right to subcontract the Q-Checks.
4.The Parties Practice
US Airways never has subcontracted HMV work in its 54-year relationship with the IAM. Rather, IAM-represented employees always have performed such work, regardless of the model of the aircraft. The IAM claims that the Company acquired a hangar in Tampa, Florida, where it could have performed the S-Checks, although it voluntarily closed the facility in November 2002.
5.The Dunsford Arbitration
US Airways presents evidence of an arbitration between it and the IAM in 1991-1992 before the U.S. Airways-IAM System Board of Adjustment/Arbitration (System Board) which Professor John Dunsford decided (the Dunsford Arbitration). The issue before the System Board was whether U.S. Airways could outsource engine overhaul work because it lacked the facilities to perform the work in house. Professor Dunsford decided that it could, noting that the IAM had not met its burden of showing that there were facilities to do the work in house. While the parties agree that this award has become part of the CBA, they dispute its meaning. US Airways claims that Professor Dunsford relied on the second sentence of Section (G) of the Second Clarification in holding that even though the engine overhaul work customarily had not been contracted out, U.S. Airways could do so in that case because it lacked the facilities to do the work in house. In contrast, the IAM believes that Professor Dunsford relied solely on Sec *259 tion (I), which creates a specific exception for aircraft engine overhauling where there is a lack of facilities.
B. Procedural Background
On August 4, 2003, the IAM notified U.S. Airways that use of an outside vendor for the S-Checks would violate the scope of the CBA and would create a major dispute. US Airways countered on August 8, 2003, that because the parties differed as to the interpretation of the CBA regarding whether S-Checks could be subcontracted, the dispute was a minor one. Thus, U.S. Airways attempted to submit the dispute to the System Board, but the IAM refused to arbitrate the dispute.
On October 6, 2003, the IAM moved in the district court for a temporary restraining order and preliminary injunction barring U.S. Airways from using an outside vendor for the S-Checks.[3] The IAM argued that the CBA required U.S. Airways to use IAM employees for its S-Checks and that use of an outside vendor constituted a major dispute, requiring maintenance of the status quo.
After oral argument, the district court held on October 21, 2003, that the dispute was a major one and it preliminarily enjoined U.S. Airways from using an outside vendor for the S-Checks. It held that U.S. Airways arguments under the CBA were obviously insubstantial and that it was attempting to remake or amend the CBA’s prohibition against HMV subcontracting. JA 18.
US Airways filed a notice of appeal and a motion for stay pending appeal. After a hearing, the district court denied U.S. Airways request for a stay, but it modified its injunction to permit U.S. Airways to complete work on one partially disassembled aircraft. On October 27, 2003, U.S. Airways moved in this court for an emergency stay pending appeal, which a motion panel denied on November 5, 2003, though at the same time it expedited the appeal. On January 12, 2004, we heard oral argument on U.S. Airways appeal.
II. JURISDICTION AND STANDARD OF REVIEW
Jurisdiction over the appeal of a preliminary injunction is proper pursuant to 28 U.S.C. § 1292(a)(1). We exercise plenary review over the question of whether the dispute is a major or minor one. See General Comm. of Adjustment v. CSX R.R. Corp., 893 F.2d 584, 589 (3d Cir.1990) (CSX). We review factual findings under the clearly erroneous standard. See Shire U.S. Inc. v. Barr Labs. Inc., 329 F.3d 348, 352 (3d Cir.2003).
III. DISCUSSION
A. Major vs. Minor Disputes
1. The Guidelines
The Railway Labor Act is the product of a joint effort by labor and management representatives to channel labor disputes into constructive resolution procedures as a means of avoiding interruptions to commerce and preventing strikes. CSX, 893 F.2d at 589. The two types of disputes that can arise under the RLA are major disputes and minor disputes. In Consolidated Rail Corp. v. Railway Labor Executives Ass’n, 491 U.S. 299, 109 S.Ct. 2477, *260 105 L.Ed.2d 250 (1989) (Conrail), the Supreme Court explained that the formal demarcation between major and minor disputes does not turn on a case-by-case determination of the importance of the issue presented or thé likelihood that it would prompt the exercise of economic self-help. Id. at 305, 109 S.Ct. at 2481. Rather, the difference between the two types of disputes is that major disputes seek to create contractual rights, while minor disputes seek to enforce them. See id. at 302, 109 S.Ct. at 2480 (holding that the inclusion of drug testing as part of railroad’s physical examinations arguably was justified by implied terms of collective bargaining agreement, and therefore dispute was minor); see also Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945).
Major disputes relate to the formation of collective bargaining agreements or efforts to secure them. They arise in the absence of such an agreement or where a party seeks to change.the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. Major disputes look to the acquisition of rights for the future, not to the assertion of rights claimed to have vested in the past. See Conrail, 491 U.S. at 302, 109 S.Ct. at 2480. As the Supreme Court stated in Conrail,
[i]n the event of a major dispute, the RLA requires the parties to undergo a lengthy process of bargaining and mediation. ... Until they have exhausted those procedures, the parties are obligated to maintain the status quo, and the employer may not implement the contested change in rates of pay, rales, or working conditions. The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury.
Id. at 302-03, 109 S.Ct. at 2480.
In contrast, minor disputes arise out of grievances or out of the interpretation or application of existing collective bargaining agreements. See id. at 303, 109 S.Ct. at 2481. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. Id. Where an employer asserts a contractual right to take the contested action, the ensuing dispute is a minor one if the action arguably is justified by the implied or express terms of the parties collective bargaining agreement. Where, by contrast, the employer’s claimed justification for the action is frivolous or obviously insubstantial, the dispute is a major one. See id. at 310, 109 S.Ct. at 2484; see also CSX, 893 F.2d at 593 (noting that the court may not consider the merits of the underlying dispute; its role is limited to determining whether the dispute can be characterized as involving the proper application or meaning of a contract provision).
A minor dispute is subject to a compulsory and binding arbitration before an adjustment board established by the employer and the unions representing the employees. That board, in this case the System Board, has exclusive jurisdiction over the dispute. There is no general statutory obligation that the employer maintain the status quo pending the arbitrator’s decision. See Conrail, 491 U.S. at 302, 109 S.Ct. at 2481. Thus, in a minor dispute, [ejach side can act on its interpretation of the existing agreements until the arbitration panel rules otherwise. CSX, 893 F.2d at 594 (citations omitted).
2. The Instant Dispute
We hold that the instant dispute is a minor one because both parties have *261 asserted rights existing under the CBA, the dispute turns on the proper interpretation or application of the CBA, and U.S. Airways argument is neither frivolous nor obviously insubstantial.
a. Both Parties Assert Rights Under the CBA
Both parties contend that the terms of the existing CBA either establish or refute the presence of the right to subcontract S-Checks. The IAM contends that the dispute can be resolved by reference to the following: (1) the scope clause (Article 2(B)) (which includes HMV work); (2) the First Clarification (which prohibits the farming out of work included in the scope clause); (3) the Second Clarification (which does not contain an exception for HMV work); and (4) U.S. Airways past practice of performing all HMV work in house.
In U.S. Airways view, the dispute can be resolved by reference to the following: (1) the scope clause (Article 2(B)) (which includes HMV work); (2) the facilities and equipment clause of Article 2(B) (which contains a meet and confer obligation when the Company lacks adequate equipment or facilities to perform the work); (3) the Second Clarification, Section (G), second sentence (which states that U.S. Airways may contract out work for which it lacks the skills, equipment or facilities to perform the work in house); (4) the Dunsford Award (upholding right to subcontract engine overhaul work when in house facilities are lacking); (5) the past practice of subcontracting aircraft maintenance work when in house equipment or facilities are lacking; and (6) the absence of any past practice of performing Airbus S-Checks. Thus, both parties contend that terms of the CBA, as interpreted through custom and past experience, determine the result in this case.
b. US Airways Argument is Neither Frivolous Nor Obviously Insubstantial
As described below, we hold that the district court erred in finding U.S. Airways position to be frivolous and obviously insubstantial.
1. US Airways Section (G) Argument
Section G of the Second Clarification reads as follows:
(G) Types of work customarily contracted out, such as parts and material which the Company could not be expected to manufacture, such as engine and airframe parts, castings, cowlings, seats, wheels and other items which are commonly manufactured as standard items for the trade by vendors. Work subcontracted out to a vendor will be of the type that cannot be manufactured or repaired in-house by existing skills/equipment or facilities of the Company.
JA 196. US Airways argues that the second sentence of Section (G), read alone, supports its position that any work may be contracted out to a vendor when the Company lacks the skills, equipment or facilities to perform the work in house. In concluding that this sentence can only be read as a clarification of the first sentence, JA 16, the district court impermissibly interpreted the CBA.[4] As U.S. Airways cor *262 rectly explains, the district court’s analysis went beyond determining whether the CBA resolved the dispute; instead, it performed the task of the arbitrator in determining the proper construction of Section (G). Of course, under U.S. Airways view, the district court’s action was impermissible even if it correctly interpreted the CBA.
2. US Airways Dunsford Award Argument
US Airways argues that the Dunsford Award is indicative that the second sentence of Section (G) is free standing. It claims that Professor Dunsford concluded that engine overhaul work customarily was not contracted out, but nonetheless U.S. Airways could contract it out because it did not have the facilities and equipment needed to perform the work in house. Thus, U.S. Airways argues that the second sentence of Section (G) gives it authority to contract out S-Checks where it lacks the facilities and equipment to perform them in house, even though this is not the type of work customarily contracted out. US Airways also counters the IAM s argument that the Dunsford Award was based solely on Section (I),[5] and not on Section (G), by stating that [although the IAM has argued that the Dunsford Award was based on Section (I) of the [Second Clarification], which applies only to engine maintenance, that could not have been the basis for the decision because Section (I) refers only to lack of facilities, and not lack of equipment or skills. Appellant’s br. at 27.
3. US Airways Equipment and Facilities Clause Argument
US Airways also argues that the district court failed to acknowledge the equipment and facilities clause of Article 2(B), which states that [i]n the event that a situation should develop whereby the equipment and facility limitations are not available or sufficient to perform such work, the Company will confer with the Union in an effort to reach an understanding with respect to how the problem is to be resolved. JA 170. US Airways argues that this clause creates at least an implied right to subcontract where the Company does not have adequate equipment or facilities. US Airways further argues that under the Dunsford Award, this clause applies whenever work is covered by the agreement (fi.g. HMV work), and not where the work is subject to an express exception under the Second Clarification, such as Section (G). As such, it concludes that even if the second sentence of Section (G) applied only to work customarily contracted out, the equipment and facilities clause of Article 2(B) creates an independent basis for the Company’s right to subcontract S-Checks. Appellant’s br. at 31.
Based on these arguments, we hold that U.S. Airways has met its relatively light burden, see Conrail, 491 U.S. at 307, 109 S.Ct. at 2482 (citation omitted), of assert *263 ing rights under the CBA that are neither frivolous nor obviously insubstantial. But we do not go further and state a view as to whether we ultimately agree with U.S. Airways or the IAM as it is not our responsibility to make such a determination. Rather, we leave the merits of the parties arguments to the System Board, and merely will lift the preliminary injunction because there is no requirement that the status quo be maintained in this minor dispute.
IV. CONCLUSION
For the reasons stated above, the order of the district court dated and entered on October 21, 2003, will be reversed and this matter will be remanded to the district court for further proceedings consistent with this opinion.

. The Railway Labor Act has covered the airline industry since 1936. See Independent Ass’n of Continental Pilots v. Continental Airlines, 155 F.3d 685, 689 (3d Cir.1998).

. References to "JA” refer to the joint appendix filed in this court.

. The IAM included in its supporting papers declarations explaining how U.S. Airways could perform the Airbus HMV work in house with existing facilities, equipment, and mechanics, both active and on layoff status. It also provided a declaration from William Freiberger, who was the IAM’s chief negotiator in the 1999 negotiations, in which he stated that during the course of the 1999 negotiations U.S. Airways had negotiated for the right to subcontract HMV work on its Boeing fleet, but never attained that right.

. The district court based its decision on the following factors: (1) the “longstanding and uninterrupted practice” of performing “heavy maintenance types of work”; (2) the "fact that such work has always been considered within the exclusive province of those employees ... as evidenced by the aforementioned history”; and (3) the fact that U.S. Airways in 1999 asked the IAM to allow it to subcontract Q-Checks on Boeing aircraft because of a backlog of that work. JA 17. It further opined that under U.S. Airways’ interpreta- *262 lion of Section (G), U.S. Airways "could unilaterally void the entire CBA based on such interpretation simply by not providing IAM-represented employees with adequate facilities or tools to perform their work." JA 17-18.
With regard to the 1999 history, U.S. Airways argues that it did not have an adequate opportunity to respond to the IAM's factual allegations, but that in any event this past negotiation is distinguishable- because there U.S. Airways was seeking permission to subcontract work for which it had adequate equipment and facilities. US Airways correctly notes that the district court’s reliance on this bargaining history is attenuated given that the court did not review the bargaining history of Section (G).

. Section (I) states as follows: "Due to lack of facilities, the Company may subcontract the major overhaul of aircraft engines during the life of this Agreement.” JA 196.