**RAILWAY LABOR EXECUTIVES' ASSOCIATION, et al., Plaintiffs,**

v.

**CHESAPEAKE WESTERN RAILWAY, et al., Defendants.**

Civ. A. No. 89–1157–A.

United States District Court, E.D. Virginia, Alexandria Division.

June 13, 1990.

John O'B. Clarke, Jr., Highshaw, Mahoney & Clarke, P.C., Washington, D.C., for plaintiffs.

Jeffrey S. Berlin, Andrew D. Koblenz, Mark E. Martin, Elizabeth H. Liebschutz, Amy R. Doberman, Richardson, Berlin & Morvillo, Washington, D.C., for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

This Railway Labor Act ("RLA") dispute, brought by fourteen labor unions and the Railway Labor Executives' Association ("RLEA") against a group of railroads, grows out of the railroads' sale, lease, and abandonment of various of the railroads' spur lines. Plaintiffs contend that defendants violated their duties under the RLA (i) to exert every reasonable effort to settle all disputes, maintain agreements and bargain only with designated employee representatives; (ii) to give written notice to bargain with its employees' representatives regarding defendants' decision to enter into intra-corporate leases and trackage rights agreements; and (iii) to comply fully with RLA bargaining and status quo obligations triggered by Section 6 notices when defendants discontinued operations and implemented lease transactions and trackage rights agreements. The defendant railroads deny plaintiffs' contentions and contend instead that the Court lacks subject matter jurisdiction because the parties' dispute is arguably over the interpretation and application of existing labor agreements and the RLA requires that such so-called "minor disputes" be resolved exclusively by arbitration. Defendant railroads further counterclaim for a permanent strike injunction to prevent the unions and RLEA from "attempting, by strike, work stoppage, or otherwise, to force [the railroads][1] to complete the process of bargaining" with the unions in connection with the Section 6 notices served by the unions prior to "selling, leasing, or otherwise disposing of" railroad lines.

The parties filed cross-motions for summary judgment and, as there were no disputed issues of material fact, the Court, on February 16, 1990, ruled that it lacked subject matter jurisdiction because plaintiffs' complaint indeed presented a "minor dispute" under the RLA. Accordingly, the Court dismissed the labor plaintiffs' claim and left the parties to their RLA arbitration remedy. Arbitration proceedings are currently ongoing.[2] As an alternative basis for summary judgment, the Court also concluded that the Interstate Commerce Commission ("ICC") has exclusive jurisdiction over transactions authorized and conducted pursuant to 49 U.S.C. § 11343. Finally, the Court held in abeyance defendants' request for an injunction to prevent plaintiffs from engaging in self-help or striking over the minor dispute. An appropriate order issued reflecting these rulings.[3] The Court gave the parties leave to file further briefs regarding the propriety of the Court's granting injunctive relief.

---

1. Norfolk Southern Co., Norfolk & Western Railway Co., and Southern Railway Co.

2. Not until May 2, 1990 did plaintiffs initiate the arbitration process by seeking a special Board of Adjustment under § 3, Second of the RLA.

Defendants there claim that plaintiffs' submitted issues are not arbitrable. The matter is now before the NMB.

3. See Order dated February 20, 1990.

Both parties filed briefs and the Court heard oral argument. As defendants represented that no strike was then imminent, the Court, by Order dated May 15, 1990, declined to grant injunctive relief. This Memorandum Opinion records the Court's reasons for its February 16 and May 15 decisions.[4]

## Background

Plaintiffs consist of the RLEA, an unincorporated association of the chief executive officers of seventeen national and international railway labor unions of the United States, and fourteen individual rail labor unions that represent defendants' employees for the purposes of collective bargaining. These entities are collectively referred to as the "labor plaintiffs."

Defendants are transportation holding companies and common carriers by rail[5] that operate rail lines in the Mid and South Atlantic region of the United States and within this Court's jurisdiction. Norfolk Southern Corporation ("NS") is the holding company that controls Norfolk and Western Railway Company ("NW") and Southern Railway Company ("Southern"). NS operates these railroads as a coordinated system often referred to as the "NS system." Chesapeake Western Railway Company ("CW"), a subsidiary of NW, is also part of the system.

This dispute was spawned by a series of sales and leases of certain NS track lines. While the details of these transactions are not material to the disposition of the case, a brief summary is included as explanatory background.

### 1. The "Thoroughbred Short Line" Program

NS has determined that some lines within its railroad system have so little traffic originating and terminating on them that they are unprofitable to operate. Other NS lines are marginally profitable today, but would require substantial capital investment for continued operation. NS has therefore determined that it must dispose of these two categories of lines by way of sale, lease or abandonment. If the lines are not disposed of to an entity who will continue their rail service, shippers and others served by the lines may lose their access to rail service.

By October, 1987, NS had identified approximately 2700 miles of unprofitable or marginally unprofitable lines. NS further determined that 1500 miles of this total had no potential for profitable operation by anyone and had to be abandoned. The remaining 1200 miles were judged to have the potential for profitable operation by "short line" operators. NS therefore decided to lease these lines, typically for 20 year periods, on terms requiring relatively low initial investments by the short line operators and providing incentives for the operators to maintain the flow of traffic connecting with the NS system. Specifically, the

---

**4.** Rapidly developing events have largely overtaken this Memorandum. After the Court's February 16th dismissal of the complaint for lack of subject matter jurisdiction, the labor plaintiffs filed an action against the Wheeling Acquisition Corporation ("Wheeling"), the purchaser of certain Norfolk & Western Railway Company lines in an effort to block the lines' sale and compel Wheeling to bargain with the labor plaintiffs over the hiring and assignment of the new Wheeling employees. After permitting the intervention of Norfolk & Western Railway Co., the Court denied the labor plaintiffs' TRO request to block the lines' sale to Wheeling and dismissed Count I of the labor plaintiffs' complaint against Wheeling on the ground that Wheeling was not then a "carrier" under RLA and hence not required to bargain with the labor plaintiffs concerning the hiring, assignment, rates of pay and seniority of its new

employees. *See RLEA, et al. v. Wheeling Acquisition Corp.,* 736 F.Supp. 1397 (E.D.Va.1990). The intervenor in the *Wheeling* case filed a counterclaim and sought a TRO to prevent the labor plaintiffs from engaging in self-help strike action designed to shut down the operations of Wheeling and the Norfolk & Western Railway Co. at three important interchange points. After hearing testimony and oral argument, the Court granted the TRO on May 17, 1990. Next, on May 23, 1990, after hearing additional testimony and oral argument, the Court issued a preliminary injunction enjoining the labor plaintiffs from engaging in strike activity to shut down the operations of Wheeling and Norfolk & Western operations.

**5.** Defendant railroads are "carriers" under the RLA, 45 U.S.C. §§ 151 *et seq.,* and the Interstate Commerce Act ("ICA"), 49 U.S.C. § 10102(4).

leases are designed to establish a rental obligation that produces a reasonable return based on the line's liquidation value, but also to provide for a credit against rental payments for every rail car interchanged with NS. This credit is calculated so that if the new operator produces traffic equal to the traffic on the line in recent years, the operator pays no rent at all. This leasing program, entitled the "Thoroughbred Short Line" ("TSL") program, was approved by NS management in early 1988, and implemented immediately.

The first TSL lease, consummated in November 1988, involved 72 miles of line in Virginia. Since the initial lease, NS and its subsidiaries have completed 14 such leases, involving an aggregate of approximately 810 miles of line.[6] Additional TSL leases are planned. Generally, the TSL leases have been carried out pursuant to ICC authorization. A provision of the Interstate Commerce Act ("ICA"), 49 U.S.C. § 11343, governs, *inter alia*, transfers of rail lines from one carrier to another. Ordinarily, transactions subject to § 11343 may be carried out only after the participants receive prior ICC approval. Under 49 U.S.C. § 10505, however, the ICC exempts certain transactions from the prior approval requirement of § 11343. Exemptions were sought and obtained for all TSL leases subject to § 11343. In all such cases, 49 U.S.C. § 10505(g) requires that the ICC impose extensive "employee protective conditions," required by 49 U.S.C. § 11347 on these transactions. These conditions, often called the *"Mendocino Coast"*[7] conditions, provide an array of compensatory benefits for employees adversely affected by a line sale or transfer transaction. In two of the

lease transactions, including the CCR lease, the lessees were companies that were not already classified as "carriers" under the ICA. These transactions with "non-carriers" were not subject to § 11343 but, instead, were governed by 49 U.S.C. § 10901. The ICC generally does not impose employee protective conditions on transactions authorized under § 10901 and did not do so in this case.

2. Other Sales and Leases to Unaffiliated Parties

The largest line disposition planned by NS was the "Ohio/P & WV" transaction. This transaction involved NW's sale of approximately 440 miles of line owned in Ohio and the sublease of approximately 121 miles of line in Ohio, West Virginia, and Pennsylvania now leased by NW from the Pittsburgh and West Virginia Railroad ("P & WV"), a company not affiliated with NS. The purchaser/sublessee in the transaction, Wheeling Acquisition Corporation ("Wheeling") is also not affiliated with NS. Wheeling was a "non-carrier" under the ICA and, as such, was initially subject to ICC authorization under § 10901. On January 12, 1990, Wheeling filed the statutorily required "Notice of Exemption" with the ICC. The labor plaintiffs sought unsuccessfully to block this transaction. *See supra* note 4. Wheeling commenced operations as a "carrier" on May 18, 1990.

3. NS Intra-corporate Transactions

a. *The CW Lease*

On January 24, 1989, Southern and CW gave notice to the ICC of their intention to engage in an intra-corporate lease[8] of

---

**6.** One such lease is the "CCR" lease. That transaction arose on January 30, 1989, when the Carolina Coastal Railway, Inc. ("CCR") filed a Verified Notice of Exemption, pursuant to 49 C.F.R. § 1150.31–34, stating that it would acquire from Southern, by lease or purchase, a 17–mile section of rail line between Pinetown and Belhaven, North Carolina. At that time, Southern employees performed all work on the Pinetown to Belhaven line under collective bargaining agreements negotiated between their designated representatives and Southern. On February 6, 1989, pursuant to ICC regulations, the transaction was exempted from ICC review

and approval and CCR assumed operations on the line pursuant to a lease with Southern. CCR employees have performed all work on the line since CCR assumed the line's operations.

**7.** *See Mendocino Coast Ry.—Lease & Operate— California Western R.R.,* 354 I.C.C. 732 (1978), *modified,* 360 I.C.C. 653 (1980), *aff'd sub nom., RLEA v. United States,* 675 F.2d 1248 (D.C.Cir. 1982).

**8.** CW's rental "payments" to Southern for the line lease consist primarily of CW's assumption of Southern's statutorily mandated common

Southern's rail lines between Harrisonburg and Mount Jackson, Virginia to CW. In addition to that lease, Southern noted its proposed abandonment of operations on 5.1 miles of rail line between Mount Jackson and Edinburg, Virginia. In February, the ICC noted that the intra-corporate lease was "specifically exempted from prior [ICC] review and approval" and that on or about March 15, 1989, Southern and CW would implement the lease and Southern would discontinue its operations on the Mount Jackson to Edinburg line. On April 15, 1989, Southern abolished the train and engine crew positions staffing its Strasburg to Harrisonburg freight train and the "mobile agent" and "agent-operator" positions headquartered at Harrisonburg. Then, two days later, Southern transferred operations between Mount Jackson and Harrisonburg to CW. Since April 17, 1989, CW employees have performed all work on the leased line. Prior to that time, Southern employees performed all the work on the leased lines. Defendant railroads claim CW employees are not represented by a labor organization and perform work at lower labor costs than Southern employees.

b. *The VIP Trackage Rights Transaction*

Southern, N & W and the Virginia Port Authority are parties to an agreement that provides for both carriers to render rail service between the Virginia Island Port ("VIP") in Front Royal, Virginia and the Norfolk International Terminals ("NIT") in Norfolk, Virginia. In reaching this agreement, NW negotiated new labor agreements with the Brotherhood of Locomotive Engineers ("BLE") and the United Transportation Union ("UTU") which represent the NW employees who man the trains used to provide this service. In one of these agreements, the parties agreed that N & W trains operating between the VIP and NIT could be operated with only an engineer and a conductor. This is in contrast to the predecessor agreements which required an engineer, a conductor and a brakeman. Finally, on March 14, 1989,

Southern and N & W filed a verified notice with the ICC exercising an intra-corporate class exemption from ICC review and approval of their proposed trackage rights agreement permitting N & W to operate its trains, with N & W crews, over Southern tracks as part of the VIP–NIT contract service.

The plaintiff rail labor unions responded to these proposed transactions in January 1988 by serving notices on Southern, N & W and NS seeking to add so-called "successor provisions" to the then-existing collective bargaining agreements. Specifically, the notices sought new terms that would (i) provide compensation guarantees for present employees; (ii) require economic protections for employees in the event of an intra-corporate lease of rail property; and (iii) provide for the assumption of existing collective bargaining agreements by any purchasers, lessees or operators of Southern, N & W or NS rail lines. Plaintiffs commenced this action on August 4, 1989 alleging that defendants violated RLA obligations when they implemented leases and other transactions after the unions served defendants with the § 6 notices proposing to modify their labor agreements to require bargaining over such transactions.

*Analysis*

I. Minor Dispute

 The well-settled, dispositive principle operative here is that courts are without jurisdiction where, as here, the controversy presented is properly categorized as a "minor dispute" under the RLA. The "major"—"minor" dispute dichotomy grew up in RLA jurisprudence as a means of distinguishing between those disputes requiring arbitration and those requiring bargaining. Whether a dispute is "major" or "minor" depends not on the dispute's importance, but rather on its relationship to existing collective bargaining agreements. *Consolidated Rail Corp. v. RLEA*, —— U.S. ——, 109 S.Ct. 2477, 2480–81, 105 L.Ed.2d 250 (1989) (*"Conrail"*); *Dement v. Richmond, Fredericksburg & Potomac R.R. Co.*, 845 F.2d 451, 462 (4th Cir.1988)

carrier obligations to provide service over the line.

("*Dement*"). Major disputes are those disputes concerning "rates of pay, rules, or working conditions." 45 U.S.C. § 156. The parties to major disputes seek to create new contractual rights. Such disputes, therefore, cannot be resolved by reference to existing labor agreements. *Conrail,* 109 S.Ct. at 2480; *Dement,* 845 F.2d at 462. Thus, the RLA contemplates that major disputes will be settled by the parties through a mandatory, protracted process of negotiation, mediation, voluntary arbitration, and conciliation, during which the status quo must be maintained. If, ultimately, the parties cannot agree, they are free to resort to "the use of economic force," *i.e.,* strikes or self-help. *Conrail,* 109 S.Ct. at 2480.

■ Minor disputes, by contrast, grow out of "grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153. Parties to minor disputes seek vindication of existing contract rights. Such disputes "may be conclusively resolved by interpreting" existing agreements. *Conrail,* 109 S.Ct. at 2480. Minor disputes that cannot be resolved by the prescribed labor agreement procedures must be referred for arbitration to the National Railway Arbitration Board ("NRAB"), or to a special board of adjustment created by the carrier and the union.[9] 45 U.S.C. § 153 First (i), Second. Thus, arbitration of minor disputes is compulsory and the boards' jurisdiction to resolve them is primary and exclusive. *Conrail,* 109 S.Ct. at 2480–81; *Andrews v. Louisville & Nashville R.R. Co.,* 406 U.S. 320, 322, 92 S.Ct. 1562, 1564, 32 L.Ed.2d 95 (1972); *Dement,* 845 F.2d at 462.

■ Where, as here, the parties disagree as to the nature of the dispute, it is the Court's role to determine if it is "major" or "minor." In so doing, the Court must apply the Supreme Court's *Conrail* test:

> Where an employer asserts a contractual right to take the contested action, the

ensuing dispute is minor *if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.*

109 S.Ct. at 2482 (emphasis added). But reference to the collective bargaining agreement is not limited to its express, written terms; implied terms may also be considered. *Conrail,* 109 S.Ct. at 2485 (finding minor dispute solely on the ground that contested action was arguably justified by "implied contractual terms, as interpreted in light of past practice"); *see also Air Line Pilots Ass'n Int'l v. Eastern Air Lines, Inc.,* 863 F.2d 891, 896 (D.C.Cir. 1988) (court must consider express contract in light of past practices), *aff'd,* 889 F.2d 291 (D.C.Cir.1989); *RLEA v. Norfolk & Western Ry. Co.,* 833 F.2d 700, 705–06 (7th Cir.1987) (parties' collective bargaining agreement "includes both the specific terms set forth in the written agreement and any well established practices that constitute a 'course of dealing' between the carrier and employees").

■ Determination of a dispute's major or minor character does not require a court to choose among contract interpretations. *Conrail,* 109 S.Ct. at 2489; *Norfolk & Portsmouth Belt Line R.R. Co. v. Brotherhood of R.R. Trainmen Lodge No. 514,* 248 F.2d 34, 43 (4th Cir.), *cert. denied,* 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274 (1958). Indeed, it is not open to the court to determine which party's asserted contractual interpretation is correct. The court must merely determine if the dispute *is capable* of resolution by reference to the agreement, without regard to the substantive merits; interpretation is the arbitrator's role. *Conrail,* 109 S.Ct. at 2489. This is a "relatively light burden" for the carrier to satisfy. *Conrail,* 109 S.Ct. at 2482. Once satisfied, the court's inquiry ends and the claim must be dismissed for lack of subject matter jurisdiction. *Id.; Kushto v. Brotherhood of Ry., Airline*

---

**9.** Unlike major disputes, minor disputes do not require that the carrier maintain the status quo. Instead, the carrier may act on its interpretation of existing agreements pending the adjustment board's decision. *Conrail,* 109 S.Ct. at 2481 and n. 5, 2484.

*and S.S. Clerks Freight Handler, Exp. and Station Employees*, 818 F.2d 290, 293 (4th Cir.1987). This burden is satisfied here.

■ NW, Southern, Southern's subsidiaries, and the plaintiff unions are parties to written labor agreements governing the rates of pay, rules, and working conditions of union-represented NW and Southern employees. NS is a party to a similar labor agreement with its TCU represented employees. In none of these agreements is there any restriction on the right of the carrier to sell, lease, abandon, or grant trackage rights over its rail lines. Nor do the agreements obligate NS, NW, or Southern to require that a purchaser or lessee of

a rail line assume the parties' existing collective bargaining agreements, or hire the carriers' employees. Rather, recognizing that a carrier's discontinuance of operations may cause jobs and work assignments to be eliminated or reduced and employees to be reassigned to different positions, the agreements include provisions, in various forms, explicitly reserving to NS, NW and Southern the flexibility to abolish jobs and furlough employees as a result of a sale, lease, abandonment, or other disposition of a rail line.[10] Thus, NS, NW, and Southern may unilaterally abolish positions and furlough employees subject only to the limited constraints prescribed in the agreements. These constraints typically require

**10.** Defendant railroads submitted excerpts of the force reduction and furlough provisions from ninety labor agreements pertinent to the challenged transactions. The provision excerpted from the agreement between Southern and many of its subsidiaries and the Brotherhood of Maintenance of Way Employees ("BMWE"), effective July 1, 1986, is typical. Rule 36(b) and (c) of that agreement states:

(b) When an employee is cut off in a force reduction, or his position or assignment is abolished, or he is displaced, as herein provided, qualifications being sufficient, he shall either (1) displace any employee his junior employed in any seniority rank in which he holds seniority in the same sub-department and seniority district within thirty (30) days from date affected, or (2) file his name and address as provided in Rule 38 of this agreement re: Notice of Desire to Retain Seniority.

(c) An employee who bids upon and is awarded a temporary vacancy shall, upon his displacement therefrom, return to position or assignment last held, if still in existence, unless it is held by a senior employee who obtained the same in the exercise of a displacement right; if such position or assignment is so held by such senior employee, or is no longer in existence, such displaced employee may exercise a displacement right as provided in paragraph (b) hereof.

Another Southern agreement is similarly typical:

(a) When forces are reduced and/or positions are abolished, at least five (5) working days advance notice shall be given employees affected thereby, except as otherwise provided in paragraphs (c) and (d) of this rule. An employee whose position is abolished may exercise his seniority rights by displacing a junior employee on a position for which he is qualified; other employees affected may exercise their seniority rights in the same manner. Except as otherwise provided in Rule E–1(k), employees displaced, whose seniority rights

and qualifications entitle them to regular positions, may assert such rights within fifteen (15) days. Employees who do not possess sufficient seniority or qualifications to displace a junior employee or who do not assert their displacement rights within the prescribed time limit shall be considered as furloughed; provided, however, employees in seniority districts having extra boards covered by Rule E–6 will go to the extra board.

(b) When forces are reduced, the position to be abolished shall be the position or positions which are no longer needed; if there be two or more positions doing the same kind of work paying different rates in the office where such abolishment is to be effected, the position paying the lowest rate shall be abolished. In reducing forces, where there are two employees in the same office assigned to the same class of work, working the same hours and receiving the same rate of pay and one of the positions is to be abolished, it will be the position held by the junior employee.

. . . .

(g) Nothing in this rule shall affect or prevent the abolishment of positions at any time, except as otherwise provided in this rule.

*Agreement between Southern and BRAC, effective May 1, 1973, Rule B–14.*

Yet another example is the agreement between NW and BMWE, effective July 1, 1986. Rule 14(a) of that agreement provides that "not less than five working days' notice" will be given "before force reductions are made," and Rule 14(c) provides that "when reducing force, seniority shall govern, first laying off junior employees of the same Class in the gang or at the point where reduction is to be made." Rule 14(b) provides that "When force reductions are made, positions are abolished or displacements occur, employees affected" (with a specified exception) shall "exercise their seniority" within ten days and "shall exhaust all seniority rights before being considered furloughed...."

that employees receive advance notice of job abolishment [11], and that furloughs occur in reverse seniority order.[12] The parties' agreements generally contain detailed procedures addressing the effects on, and rights of, employees when the carrier abolishes a job.[13] In addition, some employees are covered by agreements that provide specific income guarantees or other property protections against economic loss in the event of a displacement or transfer.[14] It is not significant that the reduction in force, furlough, and related agreement provisions do not expressly note that they apply to line dispositions. Those provisions are broadly worded and contain no limiting language suggesting their inapplicability to sales, leases, or other line dispositions.

The parties' past practices support defendants' contention that employment issues stemming from spur line abandonments, sales and leases do not require pre-transaction RLA bargaining, but instead are governed by the furlough and reduction in force provisions in the parties' collective bargaining agreements. The parties in the past have consistently relied on these collective bargaining provisions to govern in the case of such line dispositions. Often over the past twenty years, Southern and NW have ceased operations over marginal rail lines, by abandonment, sale and lease, and concurrently abolished jobs, furloughed, and reassigned employees without first negotiating with the unions.[15] Those line dispositions had a ripple effect beyond the jobs directly affected as they caused employees to exercise their seniority rights to bid for other jobs. Yet the labor plaintiffs in these circumstances never claimed that RLA bargaining had to precede the line dispositions. Instead, the parties re-

**11.** *See, e.g., NW and Brotherhood of Maintenance of Way Employees Agreement Rule 14(a)* (effective July 1, 1986) ("not less than five working days' notice" will be given "before force reductions are made"); *Southern and Brotherhood of Railway, Airline and S.S. Clerks (now TCU) Agreement Rule B–14(a)* (effective May 1, 1973) ("when forces are reduced and/or positions are abolished, at least five (5) working days advance notice shall be given").

**12.** *See, e.g., NW and Brotherhood of Maintenance of Way Employees Agreement Rule 14(c),* (effective July 1, 1986) (when force reductions are made, positions are abolished or displacements occur, employees affected" shall "exercise their seniority" within ten days and "shall exhaust all seniority rights before being considered furloughed ...").

**13.** *See, e.g., supra* note 10.

**14.** *See, e.g., NW & BRAC (now TCU) §§ 1(c), 3(d):*

An April 7, 1965 Memorandum Agreement between NW and BRAC (now TCU) recognizes the right of the carrier to effect a force reduction in the event there is a decline in business (section 1(c)), and to transfer of work throughout the merged system. That agreement also gives the affected employee the option to follow the work with moving benefits, exercise his seniority, or receive a lump-sum separation allowance (section 3(d)).

**15.** The record reflects that on more than ninety occasions since 1970, Southern and its subsidiaries have abandoned or discontinued service over 1,500 miles of rail lines without bargaining under the RLA. Similarly, the record further reflects that since 1973, NW has discontinued or abandoned rail service over 1,200 miles of rail lines without first bargaining under the RLA. In all of these instances the parties apparently relied on labor agreements to resolve any employment issues growing out of the abandonments.

This pattern of acquiescence is not limited to line abandonments. It exists in the case of sales and leases as well. On at least three occasions since 1984, NW or Southern, without prior RLA negotiations, coupled line abandonment with an immediate line sale to either an affiliated line or an unaffiliated third party for continued operations. Although the new rail operator operated the line with its own employees and pursuant to its own work arrangements, the labor plaintiffs never contested the transactions or the absence of pre-transaction RLA bargaining.

The record reflects a number of other, similar examples. On a number of occasions in the past, Southern and its subsidiaries, without RLA negotiations with their unions, have reduced their operations by selling or leasing marginal or unprofitable rail lines to other companies under the TSL program. NW has sold or leased such lines on at least seven occasions. In these instances, as on other occasions, the purchaser or lessee has operated the line with its own employees and under its own work arrangements. None of these carriers assumed Southern's or NW's labor agreements. And again, the labor plaintiffs did not (until now) contest any of these transactions and insist on pre-transaction RLA bargaining. Employee disputes arising from these transactions were apparently resolved on the basis of existing collective bargaining agreements.

solved any line disposition employment issues by relying on the collective bargaining agreement provisions governing furloughs and reductions in force. This consistent past practice furnishes persuasive support for defendants' claim that the collective bargaining agreement provisions are sufficiently broad to cover the employment issues spawned by the line transactions in issue. And importantly, as noted above, the Court need not hold conclusively that defendants' proposed interpretation of the agreements is correct. Rather, the Court need only find, as it does, that defendants' suggested interpretation is at least arguably correct.

Ample case law supports this conclusion. Courts in the Second, Third and Seventh Circuits have found essentially identical disputes to be "minor," based on the parties' collective bargaining agreement provisions and their past practices. Thus, in *General Comm. of Adjustment, United Transp. Union Western Maryland Ry. Co. v. CSX R.R. Co.*, 893 F.2d 584 (3d Cir.1990) (*"UTU v. CSX"*), a union filed an action challenging the railroad's right to sell a rail line without first bargaining under the RLA over a union § 6 notice addressing line sales. The Third Circuit held the action presented a "minor dispute" over which federal courts had no subject matter jurisdiction. The sole remedy, according to the court, was arbitration pursuant to RLA § 3, 45 U.S.C. § 153. In reaching these conclusions, the court relied on the reduction in force and furlough provisions in the

existing agreements and on a pattern of past practice of applying these provisions in three line sales and twenty-six abandonments.[16] To the same effect are *CSX Transp., Inc. v. United Transp. Union*, 879 F.2d 990 (2d Cir.1989), *cert. denied*, 488 U.S. 966, 110 S.Ct. 720, 107 L.Ed.2d 740 (1990) (*"CSXT v. UTU"*) and *Chicago & Northwestern Transp. Co. v. RLEA*, 855 F.2d 1277 (7th Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 529 (1988). *See also Atchison, Topeka & Santa Fe Ry. v. RLEA*, No. 87 C 9847, 1988 WL 116502 (N.D.Ill. October 26, 1988) (challenge to line sale held to be minor dispute in light of force reduction provisions and past practice of engaging in line sales and abandonments and concurrently abolishing jobs); *Accord Maine Central R.R. v. United Transp. Union*, 787 F.2d 780, 783 (1st Cir.) (in light of past practice, challenge to carrier's right to lease a line presents a minor dispute), *cert. denied*, 479 U.S. 848, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986). Only the Eighth Circuit in *RLEA v. Chicago & Northwestern Transp. Co.*, 890 F.2d 1024 (1989), *petition for cert. filed* March 29, 1990, is to the contrary.[17] But this case is neither apposite nor persuasive for, as the dissent notes, the court there was presented with an inadequate record on the parties' labor agreements and their past practices in connection with various line dispositions. *See* 890 F.2d at 1027. By contrast, the records in the *UTU v. CSX, CSXT v. UTU*, and *Chicago & Northwestern* cases are more

---

**16.** The similarity between the instant case and *UTU v. CSX* is vividly illustrated by the Third Circuit's comments concerning the parties' past practices and the furlough and reduction in force provisions in their collective bargaining agreements. With respect to the agreement provisions, the court noted:

> The reduction in force and furlough provisions in the agreements allowed the Railroad to unilaterally abolish job assignments after giving notice. They also addressed the rights that Union employees had when jobs were abolished—namely, the right to bid on other assignments and "bump" other employees on the basis of seniority and to receive certain benefits if furloughed. The agreements do not limit the reduction in force and furlough provisions to situations that do not involve sales.

893 F.2d at 592. And with respect to the past pattern of acquiescence, the court noted:

> The Railroad has disposed of rail lines on numerous occasions, leading to :he abolishment of many job assignments. Indeed, it has sold segments of the Western Maryland lines on three other occasions since 1983. While labor protective conditions were imposed in two of these earlier sales, no claims were then made by the Union that the Railroad was acting outside the scope of the existing agreement, even though Union employees were obviously affected by the sales.

*Id.*

**17.** Worth noting, however, is that the Eighth Circuit held the union could not prevent the carrier's planned line sale. *See* 890 F.2d at 1026. In this respect, that decision is consistent with the result reached here.

fully developed and confirm the essential similarity of those cases to the case at bar.

## II. § 6 Notices

■ In 1988 and 1989, prior to instituting this action, labor defendants filed RLA § 6 notices calling upon defendants to bargain with the unions concerning the addition of successor provisions to the parties' labor agreements.[18] Plaintiffs, in Count III, claim these notices trump the "minor" dispute analysis, create a major dispute and require maintenance of the status quo during bargaining. This claim is unconvincing; it runs counter to principle and precedent. On principle, acceptance of this claim would effectively eliminate the major-minor dispute dichotomy long used under the RLA. Substantial precedent recognizes that this would be an inappropriate result. Courts have consistently rejected claims similar to plaintiffs', finding instead that minor disputes are not transformed into major disputes by the filing of RLA § 6 notices. As the Second Circuit noted, when a dispute arising from a line sale is minor, "the service of Section 6 notices by the appellant unions would have no transforming or alchemizing effect upon that [minor dispute] situation." *CSXT v. UTU*, 879 F.2d at 1000. In the Third Circuit's words, "[t]he Union's § 6 notice does not serve to short-circuit the arbitration process Congress specifically designed to resolve minor disputes." *UTU v. CSX*, 893 F.2d at 594. *See also Air Line Pilots Ass'n v. Eastern Air Lines, Inc.*, 863 F.2d 891, 900 ("a rule that allows a party to characterize all disputes as 'major' through a unilateral action such as serving § 6 notices on the other party is unwise and contrary to the two-track procedure of the RLA"); *Chicago & North Western*

*Transp. Co. v. RLEA*, 855 F.2d 1277 (7th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 493, 102 L.Ed.2d 529 (1988); *RLEA v. Boston & Maine Corp.*, 808 F.2d 150, 156 (1st Cir.1986), *cert. denied,* 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 62 (1987); *Rutland Ry. Corp. v. Brotherhood of Locomotive Eng'rs*, 307 F.2d 21, 34–36 (2d Cir.), *cert. denied,* 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963); *Hilbert v. Pennsylvania R.R. Co.*, 290 F.2d 881, 885 (7th Cir.), *cert. denied,* 368 U.S. 900, 82 S.Ct. 174, 7 L.Ed.2d 96 (1961). In short, the labor plaintiffs' § 6 notices do not trump the major-minor analysis; they do not convert this minor dispute into a major one. The notices are effective only as to an "intended change in agreements."[19] If, as the Court has concluded here, the controversy is arguably covered by the existing agreements, then the dispute is "minor," from which it follows that the Court has no subject matter jurisdiction over the dispute, and the parties are relegated to their RLA arbitration remedy.

■ Even so, the labor plaintiffs claim that the service of their § 6 notices subjects defendants to the RLA's status quo obligation. Settled authority scuttles this claim, too. *Conrail v. RLEA*, — U.S. —, 109 S.Ct. 2477, 2481 n. 5, 105 L.Ed.2d 250 (1989) establishes that a carrier is under no obligation to maintain the status quo in a minor dispute. In such disputes, a carrier may continue to act on its interpretation of the labor agreement pending a resolution by an adjustment board under the RLA. *Conrail*, 109 S.Ct. at 2484; *see also UTU v. CSX*, 893 F.2d at 594 ("Because a minor dispute is involved, § 6's bargaining and status quo requirements are inapplicable and the arguments made by the Union on the nature of these re-

---

18. RLA § 6, 45 U.S.C. § 156, establishes the procedure for commencing and engaging in bargaining over any "intended change in agreements affecting rates of pay, rules, or working conditions." It further provides that after notice of an intended change has been given, "rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon. . . ." This provision is commonly referred to as the "status quo obligation."

19. Thus, the defendant railroads may well have an obligation to bargain with the unions as to the inclusion of such provisions in future agreements. *Cf. Pittsburg & Lake Erie R.R. v. RLEA*, — U.S. —, 109 S.Ct. 2584, 2593–97, 105 L.Ed.2d 415 (1989). That issue is not presented here.

quirements are not pertinent"); *Air Line Pilots Ass'n Int'l v. Eastern Air Lines, Inc.*, 869 F.2d 1518, 1520 (D.C.Cir.1989) (trial court "had no jurisdiction to issue a status quo injunction" in minor dispute); *Chicago & North Western Transp. Co. v. RLEA*, 855 F.2d at 1287–88 (same); *Burlington Northern R.R. v. UTU*, 862 F.2d 1266, 1277 (7th Cir.1988) (in minor dispute, carrier may "continue to apply its interpretation of the agreement" and "implement its view of the issue"); *International Ass'n of Machinists and Aerospace Workers, Dist. Lodge No. 19 v. Soo Line R.R. Co.*, 850 F.2d 368, 376 (8th Cir.) *(en banc)*, *cert. denied*, —— U.S. ——, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989); *Division No. 1, Bhd. of Locomotive Eng'rs v. Consolidated Rail Corp.*, 844 F.2d 1218, 1221 (6th Cir.1988); *UTU v. Penn Central Transp. Co.*, 505 F.2d 542, 545 (3d Cir.1974) *(per curiam )*.

■ Next, labor plaintiffs argue that even if their § 6 notices did not create a status quo obligation, the various line transactions in issue resulted or will result in loss of jobs by employees thereby causing a "change in agreements affecting rates of pay, rules or working conditions" under RLA § 6. This, plaintiffs claim, would then give rise to a duty on the part of defendants to give the unions notice of the changes and then to maintain the status quo while bargaining over the changes. Again, established authority contradicts

this claim. *Pittsburg & Lake Erie R.R. v. RLEA ("P & LE v. RLEA ")* —— U.S. ——, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989) makes clear that a carrier intending to dispose of all its assets incurs no § 6 duty to give notice and bargain over its decision. *Id.* 109 S.Ct. at 2592–93. In that case, the Supreme Court rejected the unions' claim that "loss of jobs by possibly two-thirds of the employees" would trigger the carrier's RLA § 6 notice and status quo obligations. *Id.* at 2592.[20] That the transaction in *P & LE v. RLEA* was a sale of all the carrier's assets is not a significant distinction from the instant case, which involves dispositions of only portions of a carrier's assets. No reason in principle and nothing in the *P & LE* decision requires that partial asset dispositions be treated differently from complete asset sales for purposes of the RLA § 6 notice and status quo obligations. Thus, *P & LE v. RLEA* teaches that job losses, if any, resulting from the transactions here in issue do not trigger defendant's RLA § 6 notice and status quo obligations.

In sum, this Court's minor dispute holding and its conclusion that defendants have no RLA status quo obligation dispose of the Amended Complaint and plaintiff's request for injunctive relief. It is, therefore, unnecessary to reach the merits of labor plaintiffs' other RLA claims[21] or defendants' statute of limitations and waiver defenses.[22] But still remaining for considera-

**20.** The Supreme Court in *P & LE v. RLEA* also held that a carrier disposing of its railroad operating assets pursuant to 49 U.S.C. § 10901 was required to engage in "effects bargaining" in response to union § 6 notices. Significantly, the Court also held that in the absence of existing agreement provisions prohibiting or otherwise limiting the railroad's line disposition, the carrier was under no status quo obligation. *See also RLEA v. Chicago & Northwestern Transp. Co.*, 890 F.2d 1024 (8th Cir.1989). *P & LE* is no authority for requiring even "effects bargaining" in the majority of the transactions encompassed in plaintiffs' Count III. Virtually all of the transactions have been carried out under 49 U.S.C. § 11343 rather than 49 U.S.C. § 10901. In transactions carried out under § 11343, the ICC imposes its statutorily mandated employee protective conditions, which provide an exclusive mechanism for negotiations concerning the implementation and effects of transactions. In these instances, the RLA major dispute bargain-

ing requirements do not apply. Even in the few transactions where defendants may have an "effects bargaining" obligation, that obligation does not subject the transactions to the status quo obligation. *See P & LE v. RLEA*, 109 S.Ct. at 2597.

**21.** In Count II of the Amended Complaint, labor plaintiffs contended that defendants violated their RLA obligations under §§ 2 Third and Ninth when they consummated the lease and trackage rights transactions.

**22.** Defendants contended that plaintiffs' claims are governed and barred by the six month statute of limitations contained in § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b). *See Triplett v. Brotherhood of Railway, Airline & S.S. Clerks*, 801 F.2d 700, 702 (4th Cir.1986) (§ 10(b) limitations period applied to unfair representation claims under the RLA).

tion is defendants' claim for injunctive relief against threatened self-help by the labor plaintiffs. Also remaining for consideration, as an alternative basis for summary judgment as to certain of the transactions in issue, is defendants' contention that the ICC has exclusive jurisdiction over those transactions.

### III. *ICC Exclusive Jurisdiction*

 Many of the line transactions in issue were authorized by the ICC pursuant to 49 U.S.C. § 11343.[23] Specifically, these transactions include (i) all the TSL leases, except those allowed under 49 U.S.C. § 10901, (ii) the CW lease and (iii) the VIP trackage rights transaction. In each of the transactions authorized under § 11343, the ICC has imposed its standard employee protection conditions. Pursuant to these conditions, the defendant carriers have given notice to their employees and, when required by the conditions, the defendant carriers have negotiated implementing agreements with the pertinent unions. Under these circumstances, defendants contend, the RLA is displaced and exclusive jurisdiction over these transactions and their effects on employees is vested in the ICC. This contention is valid.

In the case of § 11343 authorized transactions,[24] Congress has provided, in 49 U.S.C. § 11347, an exclusive mechanism designed to govern the rights of affected employees. This mechanism permits the parties to negotiate a fair arrangement for employees affected by covered transactions, but requires carriers implementing those transactions "to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this Section before February 5, 1976 and the terms established under section 405 of the Rail Passenger Service Act (45 U.S.C. 565)." Routinely, and in the transactions at bar, the ICC has imposed so-called *Mendocino Coast* conditions [25] which have been held to satisfy the § 11347 requirement for protective conditions. This mechanism governs exclusively the rights of employees in the covered transactions; it displaces RLA-based rights in this context.

Settled authority confirms this result. The Eighth Circuit so ruled in *Brotherhood of Locomotive Eng'rs v. Chicago & North Western Ry. Co.*, 314 F.2d 424, *cert. denied*, 375 U.S. 819, 84 S.Ct. 55, 11 L.Ed.2d 53 (1963). In reaching its conclusion, that court recognized that application of the RLA and its purposely drawn out procedures would allow unions effectively to block approved transactions.[26] In this context, as the Eighth Circuit recognized, invocation of the RLA "would threaten to prevent many consolidations" in direct contravention of congressional intent. 314 F.2d

---

Defendants also contended that certain of labor plaintiffs, specifically the BLE and the UTU, have waived any claims they may have had regarding the VIP trackage rights transaction.

**23.** This provision states, in pertinent part:

(a) The following transactions involving carriers providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I (except a pipeline carrier), II, or III of chapter 105 of this title may be carried out only with the approval and authorization of the Commission:

....

(2) a purchase, lease, or contract to operate property of another carrier by any number of carriers.

....

(6) acquisition by a rail carrier of trackage rights over, or joint ownership in or joint use of, a railroad line (and terminals incidental to it) owned or operated by another rail carrier.

**24.** The ICC's exercise of its § 11343 power may be in the form of a decision approving a transaction or a decision allowing a transaction to proceed pursuant to 49 U.S.C. § 10505 under an exemption from the provision's prior approval requirement.

**25.** *See supra* n. 7 and accompanying text.

**26.** The RLA major dispute procedures are "purposely long and drawn out," *Brotherhood of Ry. & S.S. Clerks v. Florida East Cost Ry. Co.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966), and exhaustion of them is "an almost interminable process," *Detroit & Toledo Shore Line R.R. Co. v. UTU*, 396 U.S. 142, 155, 90 S.Ct. 294, 302, 24 L.Ed.2d 325 (1969). In the end, if the parties cannot agree on terms "no authority is empowered to decide the dispute," *Elgin, Joilet & Eastern Ry. Co. v. Burley*, 325 U.S. 711, 725, 65 S.Ct. 1282, 1290–1291, 89 L.Ed. 1886 (1945), and the parties are free to resort to self-help. *Id.* at 724, 65 S.Ct. at 1290.

at 430–31. Other courts have consistently followed the Eighth Circuit's reasoning and result. *See, e.g., Brotherhood of Locomotive Eng'rs v. Boston & Maine Corp.,* 788 F.2d 794, 800–01 (1st Cir.) (ICC authorization of transactions under § 10505 precludes RLA remedies that would circumvent protective conditions), *cert. denied,* 479 U.S. 829, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986); *Burlington Northern, Inc. v. American Ry. Supervisors Ass'n,* 503 F.2d 58, 62–63 (7th Cir.1974) *(per curiam )* (employee protective agreement adopted by ICC as condition on its approval of merger was "not inconsistent with any provision of the [RLA], and if it were, its provisions would be controlling"), *cert. denied,* 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975); *Nemitz v. Norfolk & Western Ry. Co.,* 436 F.2d 841, 844–46 (6th Cir.) (where ICC adopts the terms of an employee protective agreement as conditions on its approval of a consolidation, the parties' rights under the protective conditions flow from the ICC's order, not from the original agreement, and the parties may not invoke RLA remedies for the purpose of determining their rights, which arise under the ICA), *aff'd on other grounds,* 404 U.S. 37, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971); *Brotherhood of Locomotive Eng'rs v. ICC,* 808 F.2d 1570, 1578–79 and n. 75 (D.C.Cir.1987) (arbitrator acting under ICC-imposed protective conditions is empowered to decide which labor agreements will apply to employees being transferred from one railroad to another); *see also UTU v. Norfolk & Western Ry. Co.,* 332 F.Supp. 1170, 1174–75 (N.D.Ohio 1971) (arbitration requirement of ICC-approved job protection agreement supplants RLA remedies).[27]

The ICC has also held that its § 11347 protective conditions, not the RLA, control the rights of affected employees in § 11343

transactions. *See Southern Ry—Control—Central of Georgia Ry.,* 331 I.C.C. 151 (1967); *Denver & Rio Grande Western R.R.—Trackage Rights—Mo. Pac. R.R.,* Finance Docket No. 30,000 (served October 25, 1983), *appeal dismissed sub nom. I.C.C. v. Brotherhood of Locomotive Eng'rs,* 482 U.S. 270, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987); *Maine Central R.R., et al.—Exemption,* Finance Docket No. 30532 (Served September 13, 1985), *aff'd mem. sub nom. RLEA v. ICC,* 812 F.2d 1443 (D.C.Cir.1987).

*Brotherhood of Ry. Carmen v. I.C.C.* ("Carmen"), 880 F.2d 562 (D.C.Cir.1989), *cert. granted sub nom. Norfolk and Western Ry. Co. v. American Train Dispatchers Ass'n,* — U.S. —, 110 S.Ct. 1522, 108 L.Ed.2d 762 (1990) does not contradict this line of authority. At issue there were two ICC decisions reviewing arbitrator awards made under protective conditions imposed in two ICC-approved railroad consolidations. In both cases, the ICC had ruled (i) that the consolidations were subject to 49 U.S.C. § 11341(a) as well as to § 11347, (ii) that arbitrators could override labor agreements as necessary in connection with the conditions and (iii) that the statutory protective conditions prevail over inconsistent RLA-based claims, including claims based on labor agreements. The D.C. Circuit held the § 11341(a) "does not grant the ICC its claimed power to override provisions" of a labor agreement. 880 F.2d at 574. It reversed on this point, but specifically declined to address the ICC's conclusion that by virtue of § 11347, the arbitration procedure contained in the protective conditions displaces the RLA. 880 F.2d at 573. Thus, *Carmen* is distinguishable from the settled line of authority cited above. The principal focus of *Carmen* is the ICC's § 11341(a) authority to modify or override labor

---

27. Courts have reached the same result in cases arising in the airline industry, which is also generally subject to the RLA. *See, e.g., Int'l Ass'n of Machinists and Aerospace Workers v. Northeast Airlines, Inc.,* 536 F.2d 975, 977 (1st Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 328 (1976); *Int'l Ass'n of Machinists and Aerospace Workers v. Northeast Airlines, Inc.,* 473 F.2d 549, 559–60 (1st Cir.), *cert. denied,* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972); *American Airlines, Inc. v. CAB,* 445 F.2d 891, 896–97 (2d Cir.) (Friendly, J.), *cert. denied,* 404 U.S. 1015, 92 S.Ct. 681, 30 L.Ed.2d 663 (1972); *Kent v. CAB,* 204 F.2d 263, 266 (2d Cir.) ("[a] private [labor] contract must yield to the paramount power of the [CAB] to perform its duties under the statute creating it to approve mergers...."), *cert. denied,* 346 U.S. 826, 74 S.Ct. 46, 98 L.Ed. 351 (1953).

agreements. Section 11341(a) is not central here. In the transactions at bar, the ICC has imposed employee protective conditions pursuant to § 11347, which is made applicable in exemption cases, like those at bar, by 49 U.S.C. § 10505(g)(2). *Carmen* did not reach the § 11347 issue.

In summary, certain of the challenged transactions have proceeded by virtue of the ICC's § 11343 authority, with the result that in these instances, the ICC has imposed § 11347 employee protective conditions. These transactions are immune from labor plaintiffs' RLA claims. The ICC has exclusive jurisdiction over these transactions.[28]

### IV. *Injunctive Relief for Defendant Railroads*

■■■■ In their counterclaim, the railroad defendants seek an order enjoining the labor plaintiffs from striking or engaging in any self-help in an effort to block the challenged line transactions. Such relief, they claim, is appropriate given the Court's finding that the Amended Complaint presents a minor dispute. It is true that strikes over minor disputes are prohibited and may be enjoined consistent with the Norris–LaGuardia Act, 29 U.S.C. §§ 101–15, which generally prohibits federal injunctive relief in labor disputes. *See Burlington Northern R.R. Co. v. BMWE*, 481 U.S. 429, 445, 107 S.Ct. 1841, 1850–51, 95 L.Ed.2d 381 (1987) (because it is necessary to "accommodate the competing demands of the RLA and the Norris–LaGuardia

Act," injunctive relief is appropriate to ensure "compliance with the various mandates of the [RLA]"); *Brotherhood of Redwood Trainmen v. Chicago River & Indiana R.R. Co.*, 353 U.S. 30, 42, 77 S.Ct. 635, 640–41, 1 L.Ed.2d 622 (1957); *Brotherhood of Locomotive Eng'rs v. Louisville & Nashville R.R. Co.*, 373 U.S. 33, 41–42, 83 S.Ct. 1059, 1064, 10 L.Ed.2d 172 (1963). And courts have issued strike injunctions in aid of minor dispute rulings. *See UTU v. CSX*, 893 F.2d at 595; *CSXT v. UTU*, 879 F.2d at 1004; *Chicago & North Western Transp. Co. v. RLEA*, 855 F.2d at 1288. In this instance, however, the Court concluded that injunctive relief was unnecessary in the face of labor plaintiffs' assurances that no self-help would be undertaken.[29] This result is in accord with the Supreme Court's instruction that the "judiciary should hesitate to fix upon the injunctive remedy ... unless that remedy alone can effectively guard the plaintiff's right." *Burlington Northern R.R.*, 481 U.S. at 446, 107 S.Ct. at 1851, *quoting International Ass'n of Machinists v. Street*, 367 U.S. 740, 773, 81 S.Ct. 1784, 1802, 6 L Ed.2d 1141 (1961).

Appropriate Orders dated February 16, 1990 and May 15, 1990 have issued.

---

**28.** As noted, the Court's principal holding is that the Amended Complaint presents a minor dispute over which the Court has no subject matter jurisdiction. That ruling is fully dispositive. Anticipating that the matter may be appealed, the Court chose to reach and decide the ICC exclusive jurisdiction issue as an alternative dispositive ground for dismissal as to certain of the challenged transactions.

**29.** The absence of a strike threat was made clear by the declarations filed in this matter by Richard L. Kilroy, President of the TCU, and Fred A. Hardin, President of the UTU. In this regard, Mr. Kilroy stated:

Declarant is well aware that this Court has ruled that the dispute over whether the NS rail system may sell or otherwise transfer rail lines during bargaining is a "minor" dispute subject to arbitration, and until that ruling is

overturned on appeal or vacated by this Court on reconsideration, or until this Organization is no longer restrained by the bargaining and status quo obligations of the Railway Labor Act (under Sections 2 First, 5 First and 6 of that Act) from engaging in self-help over the line sale problem, including over the impact of the Wheeling transaction on TCU members, declarant will not authorize any strike or other job action to the taken by TCU against the NS system over the Wheeling transaction or over any other NS line sale.

When the labor plaintiffs later changed their minds and resolved to employ self-help in this matter, they promptly advised the Court, which then, at the request of NW, issued specific injunctive relief in the context of a related case. *See supra* note 4.